Joe C. HUANG, Plaintiff,

v.

COLLEGE OF THE HOLY
CROSS, Defendant.

Civ. A. No. 75–1960–J.

United States District Court,
D. Massachusetts.

July 18, 1977.

---

**3.** Defendant estimated its costs may run as high as $2,000.00.

Robert J. Pleshaw, Boston, Mass., for plaintiff.

Michael P. Angelini, Bowditch & Lane, Worcester, Mass., for defendant.

OPINION

JULIAN, Senior District Judge.

This is an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1]

In July 1974 the plaintiff, Joe C. Huang, filed a charge of discrimination with the Equal Employment Opportunity Commission. Thereafter, in March 1975, the Commission, having made no determination, at the request of the plaintiff issued a "notice of right to sue within 90 days" to the plaintiff.

The plaintiff alleges that he was discriminated against by the defendant, the College of the Holy Cross, because of his race, color or national origin, and denied tenure as an associate professor in the College's Department of Political Science. Plaintiff is an Oriental and a native of China.

Plaintiff claims that the defendant applied disparate or unequal treatment, standards and procedures to plaintiff's tenure application as compared to the treatment, standards and procedures accorded and applied to the applications of others who were granted tenure in the same and previous years. The plaintiff seeks the issuance of a permanent injunction prohibiting the defendant from discharging the plaintiff or otherwise discriminating against him with respect to the terms of his employment because of his race, color or national origin, and requiring the defendant to award the plaintiff tenure as an associate professor in the Department of Political Science. Monetary damages are sought for loss of pay, as well as costs and reasonable attorneys' fees.

After a four-day trial, and after examining the pleadings and considering the evidence and the post-trial briefs and reply briefs filed by counsel, the Court has reached the following findings of fact and conclusions of law.

The plaintiff has served as an untenured associate professor of Political Science at the College of the Holy Cross, a private educational institution of higher learning situated in Worcester, Massachusetts, from September of 1972 through May of 1975. He holds a B.A. in Foreign Languages and Literature from Taiwan University, an M.A. in Journalism from Chengchih University, Taiwan, and an M.A. and Ph.D. in Political Science from the University of Southern Illinois. Prior to his appointment to the faculty of Holy Cross, the plaintiff had taught for eight years at Tougaloo College, Mississippi, where he had organized the political science department and had received tenure and a full professorship. During the academic year of 1971–72 the plaintiff served as a research associate at the East Asian Research Center at Harvard University. In 1972 the plaintiff applied for and accepted the position of associate professor at Holy Cross in order to be in closer proximity to the Research Center. He accepted the position at Holy Cross with the knowledge that he would be evaluated for tenure at the beginning of his second year of teaching.

The Administration at Holy Cross was dissatisfied with the performance of its Political Science Department. The Administration considered that department to be one of the weakest in the College. This dissatisfaction antedated plaintiff's employment at the College. The Political Science Department came into existence as a separate department in 1971, and Professor Walter T. Odell was appointed its first Chairman for a three-year term. When he was named Chairman, Professor Odell was informed by the Dean of the College, Rev. Joseph R. Fahey, that the Administration regarded the Department as one of the weakest in the College. The Dean was also displeased with the Department's preference for allowing Political Science majors

---

1. The pertinent part of 42 U.S.C. § 2000e–2 reads as follows:

"(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . or national origin; . . . ."

to plan their own curricula rather than require that all majors take certain "core courses." The Dean's concern was caused by the extremely poor showing made by Holy Cross students on national examinations (Graduate Record Exams) in the area of Political Science. Dean Fahey's position that more "core courses" should be required of all Political Science majors was known to Professor Odell in 1971. Nevertheless the Department adhered to its policy, and during all three years of Professor Odell's chairmanship there was only one required course for Political Science majors. Professor Odell was not reappointed Chairman in 1974.

The President of the College, Rev. John E. Brooks, was also dissatisfied with the quality of the Political Science faculty (especially its senior members, of whom the plaintiff was one), disagreed with its position on student course selection, and was disappointed in its procedures for recruiting new members of the faculty.

When the plaintiff applied for a position in the Political Science Department at Holy Cross, he competed against four or five other applicants. The field was eventually narrowed to the plaintiff and another individual, who was also of Oriental background. The three or four other applicants were Caucasians. The plaintiff was interviewed by members of the Political Science Department and by Dean Fahey. Dean Fahey expressed reservations regarding the hiring of the plaintiff to Professor Odell, then Chairman of the Political Science Department. These reservations concerned the fact that the plaintiff was giving up a full professorship and tenure at Tougaloo College for an associate professorship without tenure at Holy Cross, and that he would, by entering Holy Cross at the senior level of an associate professor, be evaluated for tenure in the beginning of his second year. Dean Fahey was also concerned that the plaintiff's courses might focus too narrowly upon China. He was further concerned that the students might have difficulty understanding the plaintiff's pronunciation of the English language. The Dean expressed a preference for candidate Chang, the other Oriental, whom he believed to be better qualified for the position. Nevertheless, he yielded to Chairman Odell's preference for the plaintiff and ultimately concurred in his appointment, basing his decision upon the plaintiff's performance at Tougaloo College. The President of Holy Cross, Rev. John E. Brooks, approved the hiring of the plaintiff although he had not interviewed him.

The procedures utilized in the tenure-decision process at Holy Cross are set forth in Chapter II of "The Statutes of the Faculty of the College of the Holy Cross (hereinafter "the Statutes").[2] The established interpretation of the Statutes required that the plaintiff be considered for tenure during the academic year 1973–74 (Exh. 2, p. (S) 14).[3] In evaluating a candidate for tenure, the Statutes specify that consideration must be given to evidence in the areas of teaching, scholarship, and service to the College (Exh. 2, p. (S) 12).[4]

2. The provisions of the Statutes were expressly incorporated into, and made a part of, the Holy Cross faculty employment contract signed by the plaintiff. (See Exh. 1.)

3. "Chapter II: Faculty Ranks, Appointments, Tenure and Promotion.

. . . . .

D. Duration of Faculty Appointments
Appointments to the Faculty are of two kinds: term, made for a specified period of time, and tenure, made without limitation of time.

. . . . .

2. . . . Promotion to the rank of Associate Professor should be achieved no later than the end of one's penultimate probationary year. Appointment through the ultimate probationary year is, therefore, final.
3. Initial appointment in the rank of Associate Professor is ordinarily for a three-year period; reappointment in this rank, or promotion to it, is made without limitation of time."

4. "Chapter II: Faculty Ranks, Appointments, Tenure and Promotion.

. . . . .

B. Norms for Appointment, Advancement and Tenure
As an undergraduate liberal arts college Holy Cross' prime responsibility is to provide excellent teaching for its students; therefore in decisions regarding tenure and advancement

The Statutes, and the established practice at the College, provide for a tenure review procedure consisting of four successive evaluations (Exh. 2, pp. (S) 16–17). Recommendations are first made by a Student Advisory Committee. These are based on statistical summaries of questionnaires completed by students enrolled in the candidate's classes (Exh. 29). Next, department recommendations are made on the basis of a review conducted by the department chairman along with the senior and tenured members of the candidate's department. Consideration is given to the report filed by the Student Advisory Committee, the candidate's Faculty File (Exh. 2, p. (S) 16), and the written opinions of junior faculty members who have been in the department for at least one year. Unsigned copies of the department recommendations are given to the candidate in order to provide an opportunity to respond to the report. Following the department evaluation, the Dean of the College requests the President to appoint, with the assistance of the elected faculty members of the Committee on Educational Policy, an Ad Hoc Committee to review the candidate's qualifications and the several recommendations. The Ad Hoc Committee consists of the President and Dean of the College, *ex officiis*, and three other faculty members, namely, a senior member of the candidate's department, a senior member from an associate department, and a senior member from an unrelated department, chosen with the approval of a majority of the elected faculty members of the Committee on Educational Policy. Finally, the President submits to the Board of Trustees the Ad Hoc Committee report(s) consisting of a written summary of its findings signed by the supporting Committee members. The Board of Trustees also has before it a copy of the recommendations made by the Student Advisory Committee and by the candidate's department (Exh. 29). The ultimate decision on tenure is made by the Board of Trustees (Exh. 2, p. (S) 12).

At each level of the evaluation process, the plaintiff's qualifications in the area of scholarship were acknowledged to be excellent (Exhs. 6, 5, 7, 8, 3). At the time of his tenure evaluations the plaintiff had published two books, many articles and papers, had presented a number of papers and lectures at various professional meetings and academic institutions, and had received several awards and research grants. With respect to the other bases for consideration in the tenure decision, namely, teaching and service, the various evaluations are best examined separately.

On October 16, 1973, the Student Advisory Committee issued a unanimous evaluation recommending that the plaintiff be granted tenure (Exh. 6). The evaluation

in rank teaching excellence is a principal criterion. At the same time the College recognizes its faculty is part of a wider academic community to which both the individual faculty member and the College have responsibilities involving the advancement of knowledge. These are usually met through research, publication and participation in the affairs of learned societies. Achievement in these areas is a consideration in decisions of tenure and promotion in rank. The College, too, is a cooperative society which functions well and effectively only when each member does his part. Some do more than this, however, and consideration of this exceptional service to the College community is recognized in rank and tenure decisions.
In judging an individual for appointment to or promotion in Rank, or for tenure, consideration must be given the evidence in the following area: teaching, scholarship and service.
*Teaching:*

a. Effectiveness in communicating the content of his discipline and in stimulating attitudes of intellectual curiosity and disciplined inquiry.
b. Direction and evaluation of students, in and out of the classroom.
c. Research and development of new methods, approaches and courses.
*Service:*
a. Effective contribution to the operation and development of his academic department.
b. Effective contribution to the College through committee work and other service.
c. Effective contribution to the academic community through work in professional societies.
*Scholarship: Research and Publication:*
a. Research and development in his discipline.
b. Presentation of the results of research by publication or in scholarly lectures and meetings."

noted that the great majority of the students felt the plaintiff to be a definite asset to the department and to the school; that the plaintiff's courses were "extremely well planned"; that a majority of students thought the course material was excellent; and that the plaintiff demonstrated an eagerness to help students. The report concluded by observing that the only criticism made of the plaintiff's teaching was that his classroom presentation was occasionally tedious. However, a marked improvement in this area was observed in the second-semester questionnaire responses.

On October 30, 1973, the department evaluation on the plaintiff was issued, unanimously recommending the grant of tenure (Exh. 5). The department, in considering the Student Advisory Committee report and the statistical summaries of the student questionnaires, concluded that the evidence indicated that the plaintiff, in the area of teaching, was "extremely knowledgeable, well organized and very communicative both inside and outside the classroom." There was some criticism in the report that his course presentation was tedious and that some members of the Student Advisory Committee thought that part of this reaction was caused by the difficulty some students had with the plaintiff's accent. The report noted the plaintiff's ability to teach courses outside the Far East field. In the area of service, the report asserted that the plaintiff had "made a

notable contribution to the department during his first year." In particular, the report states:

"[W]e have been impressed most of all by Dr. Huang's participation in our recruitment process last winter. In interviews with candidates who were specialists in Constitutional Law, his questions showed detailed knowledge of the field and his judgment seemed extremely penetrating and mature."

One of the two junior members of the plaintiff's department recommended him for tenure and his remarks are included in the department report. The other junior member of the department abstained from making any recommendation.

On December 21, 1973, majority and minority reports of the Ad Hoc Committee were issued (Exhs. 7, 8). Sitting on the Committee were President Brooks as Chairman, Dean Fahey, Professor Odell as the senior member of the plaintiff's department, Professor Roger P. Johnson and Rev. Robert F. Healey (Exh. 13). Four of the members of the Committee joined in a majority report recommending the plaintiff for tenure, (Exh. 7), in which positive evaluations were made of the plaintiff's teaching and service to the College. Dean Fahey submitted a minority report (Exh. 8) recommending that the plaintiff be denied tenure and giving the reasons for his position.[5]

5. "Minority Report of Ad Hoc Committee on Reappointment (to Tenure) of Dr. Joe C. Huang, Associate Professor of Political Science:

A minority of the members of the Ad Hoc Committee believes that Joe C. Huang should not be reappointed to the rank of Associate Professor without limitation of time.

The minority does not base its negative vote in any way on Prof. Huang's record in the area of research and publication. He has published a book and several articles, has delivered papers at regional and national professional meetings, and regularly attends seminars for scholars.

The minority does have some reservations about Prof. Huang's teaching, however. This is only his second year of teaching at Holy Cross. Since his initial appointment at Holy Cross was at a senior rank, the tenure decision must be made at this time. It is the

minority's belief that no faculty member should be tenured unless there is substantial evidence of good teaching performance. This is often quite difficult to attain by one's second year, but not impossible. There was such evidence by Prof. Hampsch's second year at the College and there is every indication that there will be this evidence by next year in the case of Prof. Worrell. With respect to Prof. Huang, the case has not been made to the effect that he is truly a good teacher.

The minority has doubts about whether Prof. Huang is sufficiently interested in working diligently with the vast majority of Political Science majors, those who will probably do no serious research work in the area of Political Science, but who need a solid background in Political Science. His Five-Year Plan is very specific on what he plans to do with the outstanding student, but says very little

In the matter of teaching, Dean Fahey's minority report concluded that a "case had not been made to the effect that he [the plaintiff] is truly a good teacher." The Court finds that this concern was justifiable. The plaintiff himself conceded that in his first semester at the College he experienced difficulties in adjusting.

Dean Fahey's second concern was the plaintiff's five-year plan, a document required to be submitted by every member of the faculty, detailing his projected professional activities over the next five years. Plaintiff submitted a five-page, double-spaced, typewritten document entitled, "Plan for Teaching and Research" (Exh. 42). About two pages are devoted to the subject of teaching. He states that about 15% of the students in the Political Science Department are truly outstanding; that at the other extreme some 10% of the students appear to be not only incompetent but also lacking inner drive for learning; and that in between are situated a majority, that is, about 75%, whose academic work falls into about what he plans to do for the majority of students, except for his intentions of building up a collection of books and publications in the library. There is nothing about how to approach these students in the classroom and in one's office. Moreover, since Prof. Huang was a participant in drawing up the departmental Five-Year Plan last year, the minority feels obliged to quote the following statement from this report: 'The task of instructing 80 or 90 students a semester rules out the possibility of correcting adequately weekly or bi-weekly essays, one of the best means of close teacher-student interaction.' The minority does not agree that this is impossible and believes that there are capable scholars who are willing and able to devote this type of time to students, if necessary. The minority has very serious reservations about the quality of Prof. Huang's service. Though he has not yet served on a Faculty or College committee, he has been active in departmental matters. The minority takes strong exception to Prof. Huang's influential role in the recruitment process last year. The person recommended by Prof. Huang and others in the department was rejected by both the President and Dean as not being of the quality Holy Cross should expect of its faculty. Phyllis Keller, then Director of the Office of Special Studies and now Special Assistant to the Dean of Arts and Sciences at Harvard, was depressed by the choice. The net result of the recruitment process last year was that the department failed to fill its opening in Constitutional Law.

Equally disturbing is Prof. Huang's position on the question of departmental curriculum planning. A few years ago the Dean, referring to disastrously low scores of Holy Cross students on national exams in the area of Political Science, asked that the department consider the question of whether the departmental curriculum gave sufficient guarantee that each Political Science major was being exposed to the essentials of the discipline. The answer, found in the departmental Five-Year Plan, is quite distressing: 'The majority of the department think that the best principle for organizing a student's course schedule is the individual student's goal rather than the nature of the discipline where various branches still remain quite disparate.' At the meeting of the Ad Hoc Committee, the department Chairman stated that Prof. Huang agreed with this majority position. The result of this approach is that there continues to be only one one-semester course required of a Political Science major. This is not only less than in other social science departments in the College, it is less than what is required in other liberal arts colleges. At Haverford College the Political Science major has five required courses in the department and must take six others from four specified areas in the department. At Williams College the requirements for the major are similar. In the section on Political Science in the latest Williams College Bulletin, p. 276, there is the following statement: 'The assumption of the major in Political Science is that the sequence of required courses should provide not only a substantive knowledge of politics in different contexts, but also a framework for learning, within which students should be held responsible for their own education. This reflects a view of liberal arts education which stresses the importance of personal judgment and commitment, as well as study of a discipline.' In the Department of Political Science at Holy Cross, the prevailing view is that almost all the emphasis should be on the student's interests during his undergraduate years and very little consideration is given to the question of what the professionals in the field, those teaching the subject, believe should be required of each major.

Because of its doubts about Prof. Huang's teaching and its strong reservations about the quality of Prof. Huang's service, a minority of the Ad Hoc Committee believes that Joe C. Huang has not demonstrated academic achievement as this is described in The Statutes of the Faculty and recommends to the Board of Trustees that he not be reappointed to the rank of Associate Professor without limitation of time."

the range of satisfactory achievement. He proposes that in order to raise the academic standard of the students, priority should be given to building an excellent collection of books, periodicals, and other references in the library. The plan has very little to say on the subject of teaching as described in the Statutes of the Faculty (*supra*), Chapter IIB under *Teaching*, namely, effectiveness in communicating the content of his discipline, the direction and evaluation of students, and the research and development of new methods, approaches and courses.

The major part of plaintiff's plan is devoted to a recital of his own personal projected professional activities in the field of research, in the delivery of lectures in other universities, in the publication of articles and several books. He states that he expected to be considerably involved in such professional activities in the next several years, and that he intended to spend the year 1975–76 in writing a briefly described book for publication in 1977.

Father Fahey believed that plaintiff's plan evidenced an insufficient interest in teaching the average student. I find that Father Fahey's belief and concern were well grounded.

Another area of criticism expressed in the minority report relates to the plaintiff's identification with the Political Science Department's "Five-Year Plan" (Exh. 41). Dean Fahey quoted a sentence from the plan and stated his disagreement with it.[6]

In the light of all the evidence before it, the Court finds that although the plan was reduced to writing by Professor Odell, chairman of the department, the views expressed in it represented the consensus of the faculty, including plaintiff; that the faculty, including plaintiff, participated in the discussions which produced the consensus; and that plaintiff in fact agreed with views set forth in the plan. This Court further finds that Dean Fahey sincerely believed that the plaintiff shared this view and that it reflected negatively upon his attitude as a teacher.

Reservations are expressed in the minority report concerning the quality of plaintiff's service. Dean Fahey was disturbed by the plaintiff's agreement with the Political Science Department's position on the issue of required or "core" courses, and that Political Science majors should be allowed to plan their own curricula. In his minority report Dean Fahey attributed the "disastrously low scores of Holy Cross students on national exams in the area of Political Science" to this departmental policy.

In 1971, at the beginning of his tenure as chairman of the department, and thereafter, Professor Odell held conversations with Father Fahey concerning the department's future in matters of curriculum and recruitment. Father Fahey expressed concern regarding the students' failure to do well in the Graduate Record Examinations. He was concerned over the lack of required courses in the department, that is, courses that were available but were not required of all students. Only one course was required, namely, "Introduction to Political Science"; the rest were elective. He expressed these concerns from 1971 until the Spring of 1974. He suggested that the department inquire into any possible connection between the achievement of the students who took the Graduate Record Examinations and the fact that the department had only one required course. Fahey indicated to Odell back as early as 1971 that, especially because of the very poor performance of the students, the burden should be on those faculty members who favored continuing such an unstructured curriculum in the Department of Political Science. Odell conveyed the Dean's views to the members of the department as accurately and forcibly as he could. The department, however, rejected the Dean's views.[7] Although the issue first arose be-

6. The passage in question is as follows: "The task of instructing 80 or 90 students a semester rules out the possibility of correcting adequately weekly or bi-weekly essays, one of the best means of close teacher-student interaction."

7. The Departmental Five-Year Plan (Exh. 41) at page 4 states as follows:

fore the plaintiff joined the department, it was taken up from time to time during Odell's tenure as chairman, and also after plaintiff had joined the department and plaintiff was present when the Dean's view was brought up.

The Court finds that Dean Fahey was warranted in considering plaintiff's support of this department policy of having but one required or core course as militating against. a grant of tenure.

Plaintiff played an active part in the department's faculty recruitment efforts in the Winter of 1973. In their tenure evaluation of the plaintiff (Exh. 5), Chairman Odell and the other tenured members of the department made the following statement:

"But we have been impressed most of all by Dr. Huang's participation in our recruitment process last winter."

In its majority report (Exh. 7) the Ad Hoc Committee states that the plaintiff "was particularly effective in the recruitment process." In a conversation with President Brooks and Dean Fahey in October 1973, Chairman Odell had stressed how effective and helpful the plaintiff's participation had been in the recruitment process that year.

The minority report, however, took strong exception to the plaintiff's influential role in the recruitment process for the following reasons:

"The minority takes strong exception to Prof. Huang's influential role in the recruitment process last year. The person recommended by Prof. Huang and others in the department was rejected by both the President and Dean as not being of the quality Holy Cross should expect of its faculty. Phyllis Keller, then Director of the Office of Special Studies [at Holy Cross] and now Special Assistant to the Dean of Arts and Sciences at Harvard, was depressed by the choice. The net result of the recruitment process last year was that the department failed to fill its opening in Constitutional Law."

The Court finds that Dean Fahey's serious reservations as to the quality of plaintiff's contribution to the recruitment process were held in good faith and that there is a reasonable basis in fact for them.

At the Ad Hoc Committee meeting President Brooks expressed some reservations about plaintiff's personal five-year plan on teaching and research. These reservations concerned plaintiff's comments about his teaching of undergraduates, whom he divided into two categories, those he thought extremely gifted intellectually and those whom he thought good but not gifted. President Brooks expressed concern over the comparatively short treatment that he gave to the latter group, who in plaintiff's opinion constituted 75% of the students. Nevertheless, his reservations were not embodied in the majority report. He signed the report without qualifications.

After the issuance of the Ad Hoc Committee reports, Dean Fahey spoke with President Brooks, urging the President to carefully consider the minority report and reconsider his position.

On December 20, 1973, Rev. John Paris, a member of the Religious Studies Department of the College and a respected colleague of President Brooks, wrote a letter to Father Brooks as President of the College and Chairman of the plaintiff's Ad Hoc Committee, urging that the plaintiff be denied tenure (Exhs. 12, 40).[8] The letter was

---

"The department at present specifies only one required course for all the majors. This is the Introductory course. . . .

"The majority of the department think that the best principle for organizing a student course schedule is the individual student's goal rather than the nature of the discipline where various branches still remain quite disparate. A variety of courses does not per se weaken the presentations of the department . . . but it does tempt the student to specialize narrowly in a particular field of interest. If he wishes to go on to graduate school he may not have a broad enough background to do well on the GRE [Graduate Record Examinations]. The majority of the department feel that a solution lies with a strong departmental advisory program and this is now being organized with emphasis on providing information relating to career goals."

8. Exh. 12, including deletions in the copy introduced in evidence, reads as follows:
"20 December 1973

written after the Ad Hoc Committee had met and voted four-to-one to recommend

"John E. Brooks, S.J.
Holy Cross College
Worcester, Mass.
Dear John:
I just finished reading your interview in *Crossroads*. The statement that 'tenuring is probably the key task, the most essential one that you have' prompts this note.
You are undoubtedly right that tenure is the key decision that any Administration makes. It not only affects the individual concerned; it also determines the shape the Department will take for the next several decades.
One of the Departments at Holy Cross sadly lacking in stature and strength is Political Science. My own concern with government and my professional involvement with the ethical dimentions [sic] of politics and society lead me to take an active interest in the future of that Department.
Joe Huang has been proposed for tenure as an Associate Professor of Political Science. From all that I have been able to learn his teaching ability is 'just adequate.' Several students whom I know quite well tell me that his classes are not much more than a simple reading of the assigned texts. (name deleted) who has an 'A' from Huang told me that he would not take another course from him nor would he recommend Huang's courses to others.
Of even greater concern than Huang's teaching is his outlook with regard to the Department and the College. Huang and Odell have constituted the 1972–73 hiring committee. Their judgment has, in my opinion been extremely questionable. Political science had an authorization for a Constitutional Law professor last year. I was asked to sit in on the interview of a Mr. (name deleted). My own impression garnered from his references and his presentation was that he was mediocre at best. The Department led by Odell and Huang unanimously recommended that he be hired.
In a subsequent interview Odell and Huang opposed a candidate recommended by Phyllis Keller on the grounds that he did not have familiarity with case law. His degree was in constitutional law from Brandeis. That applicant was hired by the State University of New York at Buffalo.
More interesting is the fact that the hiring committee (Odell and Huang) did not request interviews with two applicants who submitted impressive credentials in Constitutional Law. These candidates, Phillip Lyons (Ph.D. Chicago) and Michael Malbin (Ph.D. Cornell) had been highly interested in Holy Cross. They were informed that Holy Cross had hired another applicant with degrees in law and political science (Lewis). Huang, for whatever his motives, was involved in the suppression of these potential faculty members from consideration by the College. (This information came unexpectedly from a chance conversation with Prof. David Schaffer who expressed surprise that Holy Cross had such good applicants that it did not even interview colleagues whom he considered superior candidates for a teaching position in Constitutional Law.)
You undoubtedly know the history of the Dubnoff position within the Department. Copson, Ford, and Dommel asked that her name be submitted as a candidate for the Con Law slot. The hiring committee rejected that option. They then informed the other members of the Department that the Dean insisted that the candidate have written a dissertation in the area of Constitutional Law. That attempt to block Dubnoff's retention in the Department did not succeed completely, but she has not been proposed for the opening in Con Law. To date Odell and Huang have not produced any serious alternative candidate for the position.
Still another issue involving Huang is the animosity between the Department of Political Science and the Administration. One SAC member reports Huang is frequently instrumental in pushing Odell into 'standing up to the Dean.' He attempted but failed to get Departmental support for a refusal to supply the Dean's Office with such straightforward material as course descriptions.
I cannot judge Huang's expertise within his field of Asian politics. He did give a Colloquium last week on 'Chinese Literature as a Source for Political Research' which (name deleted) told me was confused, confusing, and boring. (name deleted) said that he would have walked out after fifteen minutes were it not for the politics of the situation. Should Huang be tenured the College will face a senior faculty composed of Odell, Huang, Ford, and Duff. Huang most likely would emerge as Chairman, and the Department which now constitutes the largest program on the campus, would be solidified in its mediocrity. The future of such a Department would seem bleak.
If Holy Cross is to offer the superior education it promises, we must attract first rate faculty. From my admittedly limited perspective Joe Huang is not in that category. More importantly, he has used his position on the hiring committee both to block first rate candidates (Malbin, Lyons, SUNY–B man, and Dubnoff) and to promote second rate applicants (names deleted). Such actions, in my opinion, should seriously weigh against his being offered a lifetime of influence within the Holy Cross faculty.
                                        Sincerely,"

tenure and after the issuance of the majority and minority reports of the Ad Hoc Committee. The letter consisted of a series of unfavorable allegations relating to the plaintiff's performance in the areas of teaching and service. As the letter played a significant role in the decision to deny the plaintiff tenure, it will be discussed with some particularity.

The letter asserted that the plaintiff's teaching abilities were "just adequate." Father Paris based his conclusion upon the opinions of "several" of the plaintiff's students. The major thrust of the letter, however, was directed at the plaintiff's role in the Political Science Department's recruitment process. In substance, the plaintiff and Professor Odell were alleged to have constituted the 1972–73 hiring committee. In this role they were said to have recommended a mediocrity for employment, Dr. Lewis; to have opposed several highly qualified applicants; to have "suppressed" the consideration of two superior candidates; and to have blocked the consideration of a member of the Department for the Constitutional Law position. Further, the letter accused the plaintiff of engaging in frequent efforts to "push" Odell to "stand up to the Dean."[9] In the area of scholarship, the letter reported a colleague's highly negative evaluation of a colloquium which the plaintiff had recently delivered. The letter concluded with a general criticism directed at all the senior faculty members in the Political Science Department.[10]

The Court finds that there was no formally appointed "hiring committee." The Court finds, however, that plaintiff and Odell worked in close cooperation in the recruitment efforts of the Political Science Department.

The Paris letter states that plaintiff was involved in the suppression of qualified potential faculty members from consideration by the College.[11] There is no evidence before the Court tending to substantiate such a charge.

Father Paris testified that he obtained much of the information contained in his letter (Exh. 12) from Professor Dubnoff and Professor Jones, both members of the Department of Political Science at Holy Cross.

Father Brooks did not disclose his having received the Paris letter to anyone until he produced it at the meeting of the Executive Committee on January 8, 1974.

No copy of the letter was ever sent to the plaintiff or anyone else by either Father Paris or Father Brooks. The plaintiff did not know of its existence until it surfaced in the discovery proceedings before the Equal Employment Opportunity Commission. He had no opportunity to rebut its contents.

The Paris letter was written after the issuance of the majority and minority reports of the Ad Hoc Committee. Dean Fahey did not know of Father Paris' intention to write to Father Brooks in opposition to the plaintiff's tenure.

Father Paris was at the time of the writing of the letter an Associate Professor of the Special Studies Department of the College. His own field was Social and Political Ethics. Some courses in the Religious Studies Department, of which he was also a

---

9. The Paris letter reads: "Still another issue involving Huang is the animosity between the Department of Political Science and the Administration. One SAC [Student Advisory Committee] member reports Huang is frequently instrumental in pushing Odell into 'standing up to the Dean.'" (Exh. 12.)

10. The Paris letter reads: "Should Huang be tenured the College will face a senior faculty composed of Odell, Huang, Ford, and Duff. Huang most likely would emerge as Chairman, and the Department which now constitutes the largest program on the campus, would be solid-

ified in its mediocrity. The future of such a Department would seem bleak."

11. The Paris letter (Exh. 12) states (at p. 2) that this "information came unexpectedly from a chance conversation with Prof. David Schaffer." The clear import of this statement appears to be that Paris received the information directly from Prof. Schaffer. Paris testified, however, that Prof. Dubnoff told him that she had heard this in 1973 from Prof. Schaffer, a member of the Political Science Department of Temple University.

member, were cross-registered in the Political Science Department. Father Paris was greatly interested in political science and frequently talked with members of the Political Science Department. He spoke with Chairman Odell from time to time, though they never had a close personal relationship. Paris had a close professional relationship with Professors Dommel, Dubnoff and Jones of the Political Science Department.

Professor Dommel was co-director with Paris of the Office of Special Studies and they shared the same offices, which were next door to the offices of the Political Science Department. He was in daily contact with members of the faculty of that department. He is presently giving a course in Constitutional Law. He has taught two courses in American Government in the Department of Political Science. Father Paris' academic background includes a Bachelor's degree from Boston College; a Master's degree in Government and Education from Harvard University; Master's degrees in Philosophy and Theology from Boston College; Master's and Doctor's degrees in Social Ethics from the University of Southern California; he has taken graduate courses in Political Science at McGill University in Geneva, Switzerland. He has written chapters in books on Congress, and law review articles on the United States Supreme Court.

Father Paris was deeply interested in the strengthening of the faculty of the Political Science Department. He opposed the plaintiff's tenure application solely because he sincerely believed, for the reasons set forth in his letter to President Brooks, that the plaintiff did not possess the requisite qualifications for tenure.

Father Paris was not an intruder in the recruitment of candidates for appointment to the faculty of the Political Science Department. Long before he wrote the letter to President Brooks concerning the plaintiff, Dean Fahey had discussed with Father Paris at least two candidates for appointment to the Political Science Department, and had requested Chairman Odell to make

sure that Professor Lewis met Father Paris. Professor Lewis was then being considered for appointment to the Political Science Department to teach the course on Constitutional Law.

No evidence was produced during the trial tending to prove that the plaintiff suppressed the consideration of any applicant for the position of teacher of Constitutional Law as alleged in the Paris letter. In the entire record, however, there is not a scintilla of evidence, and not the faintest suggestion, that Father Paris was motivated by racial prejudice to write the letter opposing plaintiff's candidacy for reappointment with tenure.

President Brooks did not discuss the letter or its contents with any other individual involved in the tenure review process prior to the meeting of the Executive Committee of the Board of Trustees. The contents of the letter were not disclosed to any of the other members of the Ad Hoc Committee or to the plaintiff.

Neither counsel for the plaintiff nor counsel for the defendant asked Father Brooks why he did not disclose the letter's contents to the plaintiff or afford him an opportunity to answer the adverse allegations in it.

On January 8, 1974, nineteen days after the Paris letter was written, the Executive Committee of the Board of Trustees met to review and act upon 24 promotion and tenure recommendations made by the various academic departments, Student Advisory Committees, and Ad Hoc Committees, and presented by President Brooks (Exh. 36). Of these, 11 were approved, and 13, including plaintiff, were disapproved. Of the 11 approved, 8 are listed as having Ph.D. degrees. Of the 13 disapproved, 12, including plaintiff, are listed as having Ph.D. degrees. Plaintiff was the only member of the Political Science Department to be considered for tenure that year. President Brooks attended the meeting in his capacity as Chairman of the Executive Committee. Dean Fahey attended in the capacity of "resource per-

son" to the Executive Committee in matters of promotion and tenure.[12]

Prior to the meeting, the members of the Committee had received, in connection with plaintiff's case, the following documents in addition to the reports of the Student Advisory Committee, the Political Science Department, and the Ad Hoc Committee, (see Exh. 29): a letter from Professor Odell (Exh. 10), a letter from the Chairman of the Social Science Division at Tougaloo College (Exh. 11), and statistical summaries of the student questionnaires submitted for the plaintiff's courses in the Fall of 1973. These additional materials all reflected favorably upon the plaintiff's qualifications. During the meeting President Brooks presented the Paris letter to the Committee, notifying the group that this was the first time he had disclosed it. President Brooks also stated to the group that he found the Ad Hoc Committee minority report to be quite persuasive and that it had led him to re-evaluate his position. The evidence shows that the discussion at the Executive Committee meeting consisted of a free and open exchange of ideas, questions and answers concerning the professional merits of plaintiff's tenure candidacy. It is uncontradicted that plaintiff's Oriental background was neither discussed nor commented on at either the Executive Committee or the Ad Hoc Committee meeting or at any other stage of the tenure process. At the conclusion of a 45-minute discussion of the plaintiff's case, the Executive Committee, consisting of five members, including President Brooks, voted unanimously not to grant the plaintiff tenure.

On January 29, 1974, the decision of the Executive Committee concerning the plaintiff was issued (Exh. 3). The basis for the decision, which was written by President Brooks, was stated as follows:

"At this time, the Trustees lack evidence to the effect that Professor Huang's teaching is of the quality required to justify an appointment without limitation of time. While he has not yet served on any College or Faculty committee, Professor Huang has played an active role within the Department of Political Science. The Trustees, however, have doubts concerning the quality of his departmental service, particularly in the areas of faculty recruitment and curriculum development."

President Brooks was the only member of the Executive Committee who testified at the trial.

President Brooks did not change his position on the matter of plaintiff's tenure solely upon the basis of the Paris letter. The letter, however, "played a substantive role" in changing his opinion concerning plaintiff's qualifications for tenure. Other factors contributing to the change included his own reservations concerning the plaintiff, the Ad Hoc Committee minority report, and the discussion by the Executive Committee of the plaintiff's case. President Brooks considered the statements contained in the Paris letter as having more credibility than the statements contained in the unanimous report of the Political Science Department[13] because of the President's high regard for Father Paris and his dissatisfaction with the operation of the Political Science Department.

Dean Fahey testified that up to the year 1973–74, the year that plaintiff was denied

---

12. The "resource person" to the Executive Committee is not a member of the Committee and does not vote on matters considered by the Committee. The purpose of the position is to provide the Committee with direct access to an individual able to answer questions which may arise on matters of promotion and tenure.

13. The following is an excerpt from the direct examination of President Brooks by the plaintiff's attorney, Mr. Pleshaw:

"Q. (by Mr. Pleshaw) Now, Father am I correct when I state that you placed greater emphasis on Father Paris' letter than on the recommendations made by Doctor Huang's department?
A. I placed great emphasis on Father Paris' letter.
Q. My question was: Did you place greater emphasis on Father Paris' letter than on the department recommendation of Dr. Huang?
A. Yes, I placed greater emphasis. I find Father Paris in this instance more credible than the senior members of that particular department."

tenure, no faculty member who had come in at senior rank, i. e., associate professor, and had received the unanimous recommendations of his department, the Student Advisory Committee and a majority of the Ad Hoc Committee had been denied tenure. There is no evidence, however, of how many faculty members, other than plaintiff, had come in at senior rank.

Following the issuance of the Executive Committee report, plaintiff was notified of its decision. On February 1, 1974, the plaintiff was offered a terminal contract which was required to be signed by March 1, 1974. The plaintiff did not meet the March 1 deadline, taking the position that he would not sign the contract unless his case were reviewed by the Executive Committee. Upon the express representation of President Brooks that a review would be made, and that if a favorable decision were reached a new contract would be issued, the plaintiff signed a terminal contract on April 8, 1974 (Exh. 1). The contract provided for compensation of $14,500.

The Executive Committee reconsidered the plaintiff's case and upheld its earlier decision. Consequently, the plaintiff's employment at Holy Cross terminated in May of 1975. Since that time the plaintiff has been unemployed, despite diligent efforts on his part to secure new employment both within and outside his chosen profession.

■ Contrary to plaintiff's contention, his having attained full professorship with tenure at Tougaloo College, and his appointment at the senior level of associate professor by Holy Cross, did not give rise to a presumption of tenurability in his favor at Holy Cross. Plaintiff was evaluated for tenure on the basis of his performance at Holy Cross and not on the basis of his performance at Tougaloo College. There is no evidence before the Court concerning the requirements for promotion to full or associate professorship or for tenurability at Tougaloo College.

■ The Court has considered the exhibits introduced in evidence concerning the candidacies for tenure by the Executive Committee, and all other evidence introduced concerning those candidacies, and finds that apart from the injection of the Paris letter into the tenure process of the plaintiff, the defendant applied to the plaintiff substantially the same procedures, tests and standards that it applied to all the others who were considered for tenure.

■ On all the evidence before it the Court further finds that the defendant in its employment and promotion practices has not pursued a policy of discrimination against any minority.

Section 703(a)(1) of the Civil Rights Act of 1964 provides in pertinent part that it shall be an unlawful employment practice for an employer

" . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

42 U.S.C. § 2000e–2.

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court articulated the order and allocation of proof required in an action challenging employment discrimination. Initially, the complainant must carry the burden of establishing a prima facie case of racial discrimination by a preponderance of the evidence. If the plaintiff is successful, the burden then shifts to the employer to come forward with some legitimate, nondiscriminatory reason for the discharge. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Boston Chapter N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1024 (1 Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), distinguished on other grounds, *Washington v. Davis*, 426 U.S. 229, 244–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Hochstadt v. Worcester Foundation for Experimental Biology et al.*, 545 F.2d 222, 226 (1 Cir. 1976). Finally, if the defendant sustains this burden, the plaintiff must be afforded an opportunity to show that the

defendant's stated reason is in fact a pretext.

The Supreme Court in *McDonnell Douglas Corp.* further held that a prima facie case of employment discrimination may be established by showing:

"(i) that he [plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

411 U.S. at 802, 93 S.Ct. 1824. The Court specifically acknowledged in *McDonnell Douglas*, and reiterated most recently in *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 358, 97 S.Ct. 1843, that, because the facts will vary from case to case, the method of establishing the prima facie proof will necessarily vary to accommodate the relevant fact situation.

■ In adapting the above test to a claim alleging discrimination in the denial of tenure to a member of a college faculty, we are faced neither with discharge in the usual sense nor with promotion; instead, we have a mixture of the two. Under the College Statutes and the established practices at the College, a grant of tenure to a candidate obligates the College to enter into a permanent contract with that individual "without limitation of time", i. e., until he or she attains retirement age. On the other hand, an unsuccessful tenure candidate in his penultimate probational year (final year for tenure consideration) is not only denied the promotion, but is also offered a final teaching contract which terminates in one year. Since tenure is in effect a life contract until age 65, the decision to grant or withhold it is one of the utmost importance to both the candidate and the College. See *Labat v. Board of Higher Education of City of New York*, 401 F.Supp. 753, 756 (S.D.N. Y.1975). Accordingly, a tenure "position" does not "open up" in a college in the same way as might a position in industry. Thus, this Court finds that the fourth element set out in *McDonnell Douglas* is not applicable in a denial of tenure case.

Tenure decisions normally involve difficult qualitative judgments on whether the candidate's qualifications meet the needs of the College in terms of curriculum courses, teaching excellence, and the condition of weakness or strength of the particular department. These considerations have induced reluctance in the courts to override faculty appointments and tenure decisions, absent an impermissible discrimination by the university or college. See *Faro v. New York University*, 502 F.2d 1229, 1231–32 (2 Cir. 1974); *Green v. Bd. of Regents of Texas Tech. University*, 474 F.2d 594, 595 (5 Cir. 1973); *Equal Employment Opportunity Comm. v. Tufts Inst.*, 421 F.Supp. 152, 158 (D.Mass.1975); *Peters v. Middlebury College*, 409 F.Supp. 857, 868 (D.Vt.1976). The Court appreciates how difficult it is to compare candidates from different academic departments. However, to the extent that the College has established well-defined procedures and broadly defined criteria for the decision of tenure, a comparison can be made. See *Johnson v. University of Pittsburgh*, 359 F.Supp. 1002, 1008 (W.D.Pa. 1973).

■ Thus, in adapting the *McDonnell Douglas* guidelines to the present action, the Court holds that the burden on the plaintiff is to prove: (i) that he belongs to a racial minority; (ii) that the procedure followed by the College in his case was irregular; (iii) that he was at least as qualified in accordance with the College's own standards as other candidates who did receive tenure that same year; and (iv) that he was a candidate for tenure and despite his qualifications he was denied it. We may now consider the evidence in light of the principles just enunciated.

The Court finds that the plaintiff, as an Oriental, is a member of a minority group within the general population in this country, the faculty of Holy Cross as a whole, and the Political Science Department.

Initially we are confronted by the fact that the *Huang* case is the first instance within the memory of either President Brooks or Dean Fahey in which a letter urging the denial of tenure, authored by an individual not falling within the category of those designated for consultation by the Statutes, had been introduced for consideration initially at the Executive Committee level. The tenure review procedures provided by the Statutes insure a considered review by those individuals deemed to be in the best position to reach a judgment on a candidate's qualifications in the areas of teaching, scholarship and service. The required consideration by the Student Advisory Committee, the Department, and the Ad Hoc Committee is designed to insure that no one individual or group of individuals will have a dominating influence on the tenure decision by the Executive Committee. The practice of providing an unsigned copy of the Department report affords the candidate an opportunity to defend himself and to rebut any inaccurate statements which may have been made in the report. The Court rules that although the Statutes are silent in the matter, the introduction of the Paris letter at the Executive Committee level, without its prior submission to the Ad Hoc Committee and without prior inquiry into the accuracy of the statements contained therein, violated the spirit and purpose of the tenure procedures mandated by the Statutes.[14]

14. The defendant introduced evidence showing instances where positive letters advocating tenure have been introduced into the consideration process at the level of the Executive Committee meeting. Indeed, in the plaintiff's case, documents of this nature were so introduced. However, when a letter introduced at this stage is favorable to the candidate, it cannot be said to offend the spirit of the safeguards which are built into the tenure consideration process by the Statutes for the candidate's benefit. If the College chooses to accept the materials without prior scrutiny, it is waiving a right which it possesses; it is not by-passing procedures designed for the candidate's protection.

15. No consideration has been given to the scant statistical evidence relating to the presence and treatment of minorities at Holy Cross which was introduced by both parties. The evidence was entirely too little, too inclusive, and too

The Court's comparison of the plaintiff's qualifications with those of the six individuals from other departments who were granted tenure in the same year his candidacy was considered is confined solely to the results of the application of the procedural steps required by the Statutes.[15] The evidence of their qualifications was not sufficiently detailed for closer meaningful analysis and comparison.[16] In any event, the recommendations of the Student Advisory Committee, the Department of Political Science, and the Ad Hoc Committee are intended to assist the Executive Committee in making the final decision. They are not binding on the Executive Committee. The Committee is free to give each of them such weight as in its best judgment it deems appropriate in the light of all the information before it. Thus in determining, for example, what weight should be given to the recommendation of the Department of Political Science, the Executive Committee could reasonably have taken into account the extremely poor showing made by the students of that Department in the Graduate Record Examinations.

Plaintiff did not formally "apply" for tenure, but the Statutes set a definite time when faculty members must be considered for tenure. Under the established interpretations of the Statutes, the plaintiff was required to be considered for tenure at the

incomplete. For example, no evidence was introduced indicating the number of job applications received by Holy Cross from minorities. Also, no consideration has been given to the fact that in 1973–74 Holy Cross had an Affirmative Action Officer whose duty it was to assist the College in complying with Federal regulations relevant to Affirmative Action; there is no evidence that the officer was ever involved with the plaintiff, either in his being hired or in his tenure consideration.

16. The defendant has introduced four instances other than the plaintiff's case in which candidates with unanimous endorsements from the Student Advisory Committee and from the department, as well as a majority of the Ad Hoc Committee, have been denied tenure. In one instance the Student Advisory Committee recommended tenure with a reservation.

beginning of his second year of teaching at Holy Cross.[17]

The Court is of the opinion that the introduction of the Paris letter into the plaintiff's tenure process at the Executive Committee meeting of January 8, 1974, without the knowledge of the plaintiff and without affording him an opportunity to respond to the adverse charges, opinions and comments contained in the letter, constituted disparate and unequal treatment of the plaintiff by the defendant and is sufficient to require defendant to articulate some legitimate, nondiscriminatory reason for not granting tenure to the plaintiff. The Court finds that the defendant articulated two such reasons in the decision of the Executive Committee of its Board of Trustees, dated January 29, 1974, denying tenure to the plaintiff.

The Court must decide whether, based on all the evidence before it, the Executive Committee denied the plaintiff tenure for reasons which were unrelated to the plaintiff's race, color, or national origin. The Court so finds.

One reason advanced by the defendant for the denial of tenure to the plaintiff was that the Executive Committee had reservations concerning the plaintiff's performance in the areas of teaching and service. In 1973 the Political Science Department had only eight full-time faculty members. For the past several years, the teaching in the Department as a whole had been inadequate as evidenced by the scores of Holy Cross seniors on the Graduate Record Examinations which tested their achievement in the field of political science. The Execu-

tive Committee, which was responsible for strengthening weak departments such as the Political Science Department, could reasonably have concluded that it would not further the best interest of the College by granting tenure to a political science professor whose teaching performance fell short of the degree of excellence needed by the Department of Political Science and contemplated by the College Statutes.[18]

The plaintiff's concurrence with the other members of the Department, and his opposition to the Administration, on the issue of "core" or required courses was a second reason for denying him tenure. The collision between the Administration and the Department over this issue had been marked by a strong resistance by the Department to the adoption of more required courses. The plaintiff was in accord with the Department's position on curriculum courses. The Executive Committee could properly have been unwilling to grant tenure to one who was firmly committed to the Department's policy of permitting free student selection of all courses but one, a policy which the Administration believed contributed to the disastrous showing made by the students of that Department in the Graduate Record Examinations.

A third reason for denying tenure to the plaintiff was the Executive Committee's concern with the role plaintiff had played in the unsuccessful recruitment efforts by the Political Science Department. The evidence is contradictory concerning the role that the plaintiff played in the recruitment process. The Court need not resolve this conflict in the testimony.[19] The Executive

---

17. The College, at the request of the candidate, may postpone consideration of tenure, and has done so in at least one instance. The plaintiff in this case, however, never requested a postponement.

18. "As an undergraduate liberal arts college Holy Cross' prime responsibility is to provide excellent teaching for its students; therefore in decisions regarding tenure and advancement in rank teaching excellence is a principal criterion." (Exh. 2, Chapter IIB, p. (S) 12, *supra*.)

19. Professor Odell, Chairman of the Department, who had also served on the Ad Hoc

Committee that considered plaintiff's tenure, testified on cross-examination as follows (Tr. 4–49):

"Q. Professor Huang, of course, wasn't part of any recruitment Committee?
A. He was not. We had none.
Q. You are definite about that?
A. Positive."

Professor Odell, however, in his affidavit dated April 29, 1975, which he identified at the trial (Tr. 4–51) and which is attached as Exh. B to plaintiff's "Memorandum in Support of Motion for Temporary Restraining Order," stated on page 2 as follows:

Committee not unreasonably relied upon the criticism of plaintiff's participation in the recruitment process, which is found in the minority report.

Even ignoring entirely every adverse allegation contained in the Paris letter, the Court finds that there is sufficient support in the evidence to justify the decision by the Executive Committee to deny the plaintiff tenure.

The inquiry, however, does not end here. The plaintiff "must be given a full and fair opportunity to demonstrate by competent evidence that the . . . reasons for his rejection were in fact a coverup for a racially discriminatory decision." *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804-805, 93 S.Ct. at 1826. Plaintiff was given a full and fair opportunity to do this at the trial. The Court finds that the plaintiff has failed to make such a showing.

The Executive Committee voted unanimously to deny tenure to the plaintiff. It gives two reasons for the denial:

1. Lack of evidence to the effect that plaintiff's teaching was of the quality required to justify an appointment without limitation of time; and

2. Its doubts concerning the quality of his departmental service, particularly in the areas of faculty recruitment and curriculum development.

Both reasons are supported by the evidence.

"During his first year we put him on the departmental recruiting committee and he was the best person we had in interviewing candidates for a position in Constitutional Law."

At the trial the plaintiff testified as follows (Tr. 1–62):

"Q. In this letter Father Paris indicated that Odell and you comprised the hiring committee, is that a true statement?
A. There was no hiring committee.
Q. Again, will you tell the Court what your role was in recruitment, please? What was your role in recruitment in the year '72–73?
A. My role was limited to review applications."

Plaintiff then testified, however, that he interviewed some candidates for appointment to the Political Science Department (Tr. 1–64):

The Executive Committee made its decision [20] on the basis of all the information that was presented to it at its meeting of January 8, 1974, without regard to plaintiff's race, color or national origin. Considerations of race, color or national origin played no part whatever at any stage of the decisional process that led to the denial of tenure to the plaintiff.

The reasons given by the Executive Committee were not in fact a mask or coverup for a racially discriminatory decision.

The plaintiff has failed to prove that the defendant discriminated against him because of his race, color or national origin, which is the only claim alleged by the plaintiff and litigated by the parties. Therefore, the plaintiff is not entitled to recover. Accordingly, it is ordered that judgment be entered for the defendant. Plaintiff's request for costs and attorneys' fees is denied.

"Q. Did you ever interview a candidate by the name of Professor Lewis?
A. I did."
[Professor Lewis was a candidate for the position in Constitutional Law]
and, at Tr. 1–65:
"Q. Did you at any time interview a candidate by the name of Heffron?
A. Yes."
Questioned as to whether he had interviewed Professors Lyons, Malbin, and Novak, who were also candidates for appointment to the Political Science Department, plaintiff answered in each instance: "I don't recall." (Tr. 1–62–64.)

20. The Executive Committee is authorized by the Board of Trustees to act in its name (Exh. 3).