Alvin V. LABAT, Plaintiff,

v.

The **BOARD OF HIGHER EDUCATION**
OF the **CITY OF NEW YORK** et al.,
Defendants.

No. 74 Civ. 4328.

United States District Court,
S. D. New York.

July 24, 1975.

Jack Greenberg, O. Peter Sherwood, New York City, for plaintiff.

W. Bernard Richland, Corp. Counsel, New York City, for defendants; Michael S. Cecere, Eileen F. Shapiro, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Alvin V. Labat, a black citizen of the United States, brings this action under Title VII of the Civil Rights Act of 1964,[1] 42 U.S.C., sections 1981 and 1983, and the Fourteenth Amendment of the United States Constitution. In substance, he charges that denial to him of reappointment with tenure as an associate professor at Queens College was based on racial discrimination and not on lack of merit or fitness for the position, in violation of the New York State Constitution[2] and a provision of New York's Education Law.[3]

1. 42 U.S.C. § 2000e.

2. Article V, § 6.

3. N.Y. Education Law, McKinney's Consol. Laws, c. 16, § 6206(7).

Queens College is one of twenty semi-autonomous colleges comprising the City University of New York ("CUNY") which is governed by a Board of Higher Education ("Board") composed of eleven appointed officials, one if whom is the President. The Board and its President are named as defendants; also named are the Chancellor of CUNY, the President of Queens College, and individual members of the Queens College Personnel and Budget Committee, whose recommendation led to the denial of tenure to plaintiff. The defendants deny plaintiff's charge of racial discrimination, and affirmatively assert that the denial of tenure was made in good faith and was a proper exercise of academic judgment based on plaintiff's lack of qualification.

Upon a full review of the evidence, including the demeanor of plaintiff's and defendants' witnesses, I am persuaded that the denial of tenure was made in good faith, based upon established, reasonable criteria that were applied fairly to plaintiff and all candidates for tenured associate professorships at Queens College.

Plaintiff was appointed an associate professor in the Department of Romance Languages at Queens College in the Fall of 1969 with a specialty in 17th and 20th Century French Literature. The position was tenure bearing. Under the Board's by-laws a person in tenure-bearing rank was subject to reappointment each academic year, and within five years of service either he was re-appointed with tenure or his service was terminated. Plaintiff was reappointed without tenure in each of the succeeding four years following his original appointment. Although he became eligible for tenure in the Fall of 1973, his application (and those of others) was considered in the Spring of that year. Under the usual procedure, an applicant's record is first reviewed and evaluated by his department's Personnel and Budget Committee ("Department P & B"), composed of five tenured members of the Department, including its Chairman. Its recommendation is then forwarded to the College Personnel and Budget Committee ("College P & B"), which consists of all department chairmen, and in turn is referred to a subcommittee known as the Committee of Six. The Committee of Six makes its recommendation to the College P & B, which further considers the matter and reports its recommendation to the President of the college. Final approval of tenure recommendations is made by the Board.

The Department P & B recommended plaintiff for tenure by a three to two vote. The recommendation of the Department P & B was noted on a form which contained pertinent information about plaintiff's experience and qualifications. The form requires a listing of publications within the last five years. The only one listed was a review article. Plaintiff did submit to the Department P & B a copy of an unpublished manuscript on Marcel Proust. It was basically the same manuscript that he had described five years earlier in 1968 in his curriculum vitae submitted to Queens College when he was under consideration for initial appointment, and which he had "hope[d] to have published" that year.[4] The Department P & B's recomdation referred to this still unpublished work.

The Committee of Six, which included the Chairman of plaintiff's department, unanimously voted to recommend denial of plaintiff's reappointment with tenure. The entire College P & B Committee, composed of thirty senior members of the faculty, approved the action of the Committee of Six. Plaintiff appealed to the President of the College, who reviewed the matter in association with all the deans at the College to determine whether there was (1) any procedural defect or (2) any act of discrimination which would require reversal. The President concluded there was no basis for reversal on either ground, accepted

4. Defendants' Exhibit A.

the academic judgment of the Committee of Six, and denied plaintiff's appeal.[5]

Plaintiff's limited writing and publication record over the years of his academic life was a significant factor in the denial of tenure. That his qualifications in this area were thin can hardly be disputed. It was a matter of concern to several members of the Department P & B which recommended tenure by the three to two vote. During the five years plaintiff was at Queens College the only published item was a column-and-a-half review article. From 1954 to 1973 the only other items printed in scholarly publications were a one-column review article in 1962 and a contribution to a French bibliography in the 1950's. The manuscript on Marcel Proust, which was in preparation in 1968 before plaintiff's appointment at Queens College, was completed in 1972, shortly before he was considered for tenure appointment. However, this had not been published, nor had it been submitted to any publisher. In the Fall of 1973, plaintiff was under contract to publish a monograph on Alain-Fournier, which he planned to finish by December 1974, but which at the trial he testified he hoped to finish by December 1975.

Plaintiff acknowledges that under the by-laws a candidate, particularly at the rank of associate professor, is required to have a record of scholarly publications. He also recognizes ( that his publication record was limited, but contends that undue emphasis was given to the factor of publication of scholarly writings and not enough weight to his teaching effectiveness. Under the Board's by-laws the criteria applied to determine reappointment and tenure are essentially (1) teaching effectiveness; (2) scholarly and research activity; and (3) service to the community, college and nation.[6]

Plaintiff contends that on September 1, 1973, a month and ten days prior to the time his candidacy was considered by the Committee of Six, the standards established by the by-laws for determining tenure were superseded by the provisions of the collective bargaining agreement[7]

---

5. Persons in plaintiff's job title are covered by the terms of a collective bargaining agreement between their representative Professional Staff Congress ("PSC") and the Board. Plaintiff invoked the grievance procedure under the agreement and, following the first step, the President's designee held there had been no violation of the by-laws of the Board or the collective bargaining agreement. The President's designee did rule, however, that plaintiff was entitled to have the Department P & B reconsider his application for tenure since another candidate had been reconsidered. However, plaintiff did not resubmit his application to the Department P & B. Thereafter, upon advice of counsel, he abandoned the second and third grievance steps. Plaintiff filed a charge against defendants with the Equal Employment Opportunity Commission, which, not having taken action within 180 days after it assumed jurisdiction, issued a letter notifying plaintiff of his right to institute suit under Title VII of the Civil Rights Act of 1964, following which this action was commenced.

6. Article 11 provides:
"2. *Assistant Professor.* For appointment as or promotion (for instructors appointed prior to October 1, 1968) to assistant professor, the candidate must have demonstrated satisfactory qualities of personality and character, evidence of signifcant success as a teacher, interest in productive scholarship or creative achievement and willingness to cooperate with others for the good of the institution. . . .

. . . . .

"3. *Associate Professor.* For promotion or appointment to the rank of associate professor, the candidate must possess the qualifications for an assistant professor except that he must have obtained the Ph.D. or an equivalent degree from an accredited university, and in addition he must possess a record of significant achievement in his field or profession, or as a college or university administrator. There shall be evidence that his alertness and intellectual energy are respected outside his own immediate academic community. There shall be evidence of his continued growth. Longevity and seniority alone shall not be sufficient for promotion."

7. "18.2 (a) *Evaluation of a member of the teaching faculty* shall be based on total academic performance, with especial atten-

so as to shift the emphasis in selection standards from scholarly publication to teaching effectiveness. The argument continues that in judging plaintiff's qualifications, the Committee of Six erroneously applied the standards set forth in the by-laws rather than those imposed by the collective bargaining agreement; that had the Committee of Six given appropriate weight to the latter, he would have been granted tenure; and that in end result the denial of tenure was due to discrimination against him, particularly since the quality of his teaching is unchallenged. The record does not establish that the standards were changed by the collective bargaining agreement. Indeed, the evidence indicates the contract provision was a refinement or clarification of the by-law standards, and continued to include "scholarly writing."

Since tenure is in effect a life contract to age 70, the decision to grant or withhold it is one of great significance not only to the candidate, but to the university as well, and consequently the applicable criteria are rigidly enforced. As the President of Queens College testified: "There is no more important decision in the life of an institution" than the tenure decision. He also testified that "Queens has a tradition of fairly rigorous standards with regard to high quality scholarship, which means publications, either for books or in referee journals [8] and those articles or books are read and judged in terms of their contributions to the larger discipline."

■ The criteria for tenure were reasonable and were fairly applied—and this would be so even were plaintiff's contention correct that the collective bargaining agreement placed greater emphasis upon teaching ability than upon scholarship and publication.

Plaintiff, however, insists that the determination was racially motivated. He relies upon *McDonnell Douglas Corp. v. Green* [9] to establish a prima facia case of racial discrimination. But the factual setting of that case was quite different from this case, and the elements of proof in that case are of limited applicability in this case. [10] More importantly, plaintiff here assumes one of the four elements there used to establish a prima facie case, to wit, that he "was qualified for [the] job"—the very issue presented to the defendants.

Plaintiff also relies upon cases in which statistical evidence has been held sufficient to establish a prima facie case of racial discrimination. [11] But the statistics upon which plaintiff relies are obscure, confusing and do not sustain his claim. For example, he contends that prior to the time of his consideration for tenure, the College P & B had acted favorably on every white male recommended for reappointment with tenure by the Department P & B. But the statistics show that in addition to plaintiff, a white male and a white female were also denied tenure between 1970 and 1973 in spite of favorable recommendations by the Department P & B, and that

tion to teaching effectiveness, including, but not limited to, such elements as:
1. Classroom instruction and related activities;
2. Administrative assignments;
3. Research;
4. Scholarly writing;
5. Departmental, college and university assignment;
6. Student guidance;
7. Course and curricula development;
8. Creative works in individual's discipline;
9. Public and professional activities in field of speciality."
[footnote omitted]

8. A referee journal is a publication with a high scholarly reputation because scholars select the material to be published.

9. 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973).

10. *See id.* n. 13.

11. *See, e. g., Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 53–54 (5th Cir. 1974); *Resendis v. Lee Way Motor Freight, Inc.*, 505 F.2d 69 (5th Cir. 1974).

over half of the white candidates in that period were denied tenure.

Plaintiff further argues that since the College P & B reviews all departmental recommendations for reappointment, it is relevant to consider on a college-wide basis the number of blacks and whites with tenure. He points to the fact that in 1972, the only year for which college-wide statistics show a breakdown by race of the number of persons tenured or in tenure-bearing job classifications, eighteen blacks and 724 whites were employed in tenure-bearing job classifications. Of the 724 whites, 524 (72.376%) had tenure; of the eighteen black persons, ten (55.555%) had tenure. Plaintiff argues that these statistics show disparate treatment of blacks and whites, and that together with the evidence of his qualifications, they are sufficient to place the burden on defendants to demonstrate he was not the victim of unlawful discrimination.

The court does not agree that these statistics show "disparate" treatment, but even assuming arguendo that they do, and that the burden of persuasion to show non-discrimination was shifted to the defendants,[12] they have abundantly carried that burden. The overwhelming weight of the evidence on the entire case establishes that the decision to deny tenure was made in good faith based upon criteria fairly applied to plaintiff and all other candidates for the position of associate professor with tenure, and that plaintiff's race played no part in the judgment of the defendants.

The weight to be given scholarly writings and their publication in a tenure decision involves judgmental evaluation by those who live in the academic world[13] and who are charged with responsibility of decision. Scholarship and research have been described as "the indispensable tools of the scholar's trade,"[14] and as such they should be left to scholars. Absent a showing of discrimination or other violation of constitutional or statutory rights, the court is guided by the words of Judge Moore: "Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision."[15] This surely is not a case for federal intervention.

The complaint is dismissed and judgment is rendered in favor of defendants on the merits.

---

12. *See Vulcan Society v. Civil Service Commission,* 490 F.2d 387, 393 (2d Cir. 1973).

13. *Green v. Board of Regents,* 474 F.2d 594 (5th Cir. 1973), *aff'g* 335 F.Supp. 249 (N.D. Tex.1971).

14. *Weise v. Syracuse University,* 522 F.2d 397, 405 (2d Cir., July 14, 1975).

15. *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir. 1974).