Geraldine POWELL, Plaintiff-Appellant,

v.

SYRACUSE UNIVERSITY et al., Defendants-Appellees.

No. 528, Docket 77–7490.

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1978.

Decided July 13, 1978.

James I. Meyerson, New York City (N.A.A.C.P., New York City), for appellant.

David N. Sexton, Syracuse, N. Y. (Bond, Schoeneck & King, William F. Fitzpatrick, Syracuse, N. Y., of counsel), for appellees.

Before MOORE, SMITH and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Geraldine Powell, formerly a visiting assistant professor at the Syracuse University School of Architecture, appeals from a judgment of dismissal entered in the United States District Court for the Northern District of New York, Edmund Port, *Judge.* Judge Port found that, contrary to the appellant's contentions, the university had legitimate, nondiscriminatory reasons for terminating Ms. Powell's employment, and was accordingly not in violation of either Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* or 42 U.S.C. § 1981. We find no error in the result reached by the court, and affirm the judgment.

### I.

In December, 1973, Ms. Powell was informed by the Dean of the Architecture School that her contract would not be renewed for the 1974–75 academic year. She subsequently filed a claim of discrimination based on race, color, and sex with the New York State Division of Human Rights. After hearings before an agency examiner, the Division of Human Rights dismissed the appellant's complaint for failure to prove that she was terminated from her employment, or denied equal terms, conditions, or privileges of employment, because of her race, color, or sex.[1] While the state complaint was pending, appellant filed a similar complaint with the Equal Employment Opportunity Commission ("EEOC"), receiving a right-to-sue letter on September 10, 1975.[2] She subsequently commenced this action within the 90-day period required by statute.[3] The case was submitted to the district court upon the transcript of hearings before the New York State Division of Human Rights, stipulated facts and exhibits, and the parties' briefs.[4]

### II.

The findings of basic fact made by the district court are well supported by the record. Accordingly, we accept them for purposes of this appeal, and summarize them below.

Ms. Powell has an extensive academic background. She studied art in high school, but later changed fields, receiving a Registered Nurse's degree from New York University in 1959. In 1971, she received a Bachelor of Fine Arts degree from Syracuse University, and later was awarded the Master of Fine Arts degree in Environmental Design. Her master's thesis concerned the relationship of low income housing to black studies in Syracuse.

In April, 1972, appellant was interviewed for a teaching position by the Dean of the Syracuse University School of Architecture. Despite the fact that appellant had not yet earned her Master's degree, did not have any formal training in architecture, and had no teaching experience, she was hired for the academic year 1972–73 at the rank of lecturer (part-time), receiving an annual salary of $3,000.

During the fall semester, 1972, appellant taught one section of the basic design course. Prior to 1975, a detailed student manual for this course did not exist, and

---

1. The Division of Human Rights also found that appellant failed to prove that the university retaliated against her upon learning that she had filed a claim of discrimination.

2. This letter was dated August 28, 1975.

3. The Office of the Clerk of the United States District Court received appellant's complaint on December 4, 1975. Because of bookkeeping technicalities, the complaint was not formally filed until December 15, 1975. The complaint was treated by the district court as timely filed. See Appendix at 12–14.

4. The complaint was subsequently amended to include a charge brought pursuant to 42 U.S.C. § 1981.

each section teacher was free to fashion his own course curriculum after reading the course description in the School of Architecture's annual bulletin, and consulting with the dean and other faculty members teaching the course. Ms. Powell did not receive any criticism from other faculty members during her first semester on the faculty.

In December, 1972, appellant again met with the dean, who expressed an interest in promoting her to a full-time position. The following spring, however, the school's Committee on Appointments, Tenure, and Promotion voted not to promote the appellant, but to permit her to continue teaching part time on the condition that she not teach basic design. Appellant was told that she would not be teaching the design course because of a decrease in enrollment; she was not told about the committee's vote.

The dean, on his own initiative, promoted Ms. Powell to the rank of part-time visiting assistant professor and raised her salary to $5,500 per year. The parties did not enter into a written agreement concerning the 1973–74 school year at that time, and there was subsequently considerable misunderstanding as to appellant's teaching responsibilities. It was finally determined that she would teach architectural rendering,[5] serve as advisor to minority students, and deliver five guest lectures on non-western architecture.

In November, 1973, appellant was advised by the dean that her employment status was to be reviewed by the Tenure Committee. Shortly before the Thanksgiving vacation, she was asked to provide the committee with a summary of her Master's thesis, and samples of her students' work. The appellant was under the impression that she had only a couple of days during which to organize her submission, although the dean testified that he told her that the material was not required until December 1, an approximately ten-day period. Appellant submitted those student projects which had been left in the studio during the vacation period, believing that they did not represent the best of her students' work; she also submitted a hand-written summary of her thesis. She did not, however, request a postponement of the committee meeting.

The Tenure Committee met on December 1, 1973 to consider the appellant's continued employment during the 1974–75 school year. The dean, six faculty members, and two students attended the meeting, which focused, in relevant part, on Ms. Powell's written statement, and on an evaluation of her students' projects. The minutes of this meeting indicate that there was some discussion of the appellant's approach to a "black aesthetic," and that a white, female faculty member was permitted to delay committee consideration of her case. In a secret ballot taken at the meeting, eight individuals voted in opposition to, and one voted in favor of, continuing appellant on the architecture faculty.

Those who voted against the appellant testified before the New York State Division of Human Rights that their votes were based on an evaluation of the student work, and on the appellant's background and relative inexperience. They testified further that their attitudes had not been influenced by the appellant's race or sex.

The dean transmitted the results of the committee vote to the appellant, indicating that he believed that the committee thought the appellant unduly "nationalistic."[6] The appellant refused to submit a letter of resignation, appealing the committee's decision to the university's Subcommittee on Academic Freedom. The subcommittee did not find any evidence of discrimination, but did believe that there had been procedural irregularities in the disposition of the case. It recommended the reinstatement of the appellant, or alternatively, the payment of compensation, but these suggestions were rejected by the dean.

---

**5.** No formal description of the rendering course was developed until September, 1974. (App. at 129) The school's faculty disagreed as to whether rendering was best taught by an architect or an artist.

**6.** This testimony was discounted by the trial court in view of the dean's favorable attitude toward the appellant.

Ms. Powell received a letter of termination in May, 1974. The architecture school later hired a white male with a master's degree in architecture to teach rendering, and a white female with a Master of Fine Arts degree, to teach basic design. It also hired a white female with a Master's and Doctoral degree in history to teach architectural history.[7]

### III.

On this appeal, Ms. Powell asserts that her dismissal was the product of racial and sexual bias, and hence unlawful. She contends that similarly qualified teachers who were white or male received preferred treatment, and that the justification for her dismissal offered by the Tenure Committee was merely pretextual.

By contrast, the appellees argue that Ms. Powell failed to prove that her dismissal was motivated by unlawful bias. They assert that the Tenure Committee made a valid qualitative judgment which should, in the absence of a clear showing of discrimination, be respected by reviewing courts.

Both the appellees and the trial court place great emphasis on our opinion in *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974), where we wrote:

Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision. Dr. Faro would remove any subjective judgments by her faculty colleagues in the decision-making process by having the courts examine "the university's recruitment, compensation, promotion and termination and by analyzing the way these procedures are applied to the claimant personally" (Applt's Br. p. 26). . . . Such a procedure, in effect, would require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful. [502 F.2d at 1231–32]

In recent years, many courts have cited the *Faro* opinion for the broad proposition that courts should exercise minimal scrutiny of college and university employment practices.[8] Other courts, while not citing *Faro*, have concurred in its sentiments.[9]

This anti-interventionist policy has rendered colleges and universities virtually immune to charges of employment bias, at least when that bias is not expressed overtly. We fear, however, that the common-sense position we took in *Faro*, namely that courts must be ever-mindful of relative institutional competences, has been pressed beyond all reasonable limits, and may be employed to undercut the explicit legislative intent of the Civil Rights Act of 1964. In affirming here, we do not rely on any such policy of self-abnegation where colleges are concerned.

---

7. At the time that the architecture school refused to renew Ms. Powell's contract, three male and one female faculty members resigned from the faculty. Subsequently, two men resigned, and the contracts of one man and one woman were not renewed. None of these individuals taught basic design or rendering.

8. See, *e. g., Huang v. College of the Holy Cross*, 436 F.Supp. 639, 653 (D.Mass.1977); *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1353–54 (W.D.Pa.1977); *Cussler v. University of Maryland*, 430 F.Supp. 602, 605–06 (D.Md. 1977); *Peters v. Middlebury College*, 409 F.Supp. 857, 868 (D.Vt.1976); *Labat v. Board of Education*, 401 F.Supp. 753, 757 (S.D.N.Y. 1975); *Moore v. Kibbee*, 381 F.Supp. 834, 839 (E.D.N.Y.1974).

9. See, *e. g., Megill v. Board of Regents of the State of Florida*, 541 F.2d 1073 (5th Cir. 1976); *Stebbins v. Weaver*, 537 F.2d 939, 943 (7th Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Duke v. North Texas State University*, 469 F.2d 829, 838 (5th Cir. 1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973); *EEOC v. Tufts Institution of Learning*, 421 F.Supp. 152, 158 (D.Mass. 1975); *Keddie v. Pennsylvania State University*, 412 F.Supp. 1264, 1270 (M.D.Pa.1976); *Green v. Board of Regents of Texas Tech University*, 335 F.Supp. 249, 251 (N.D.Tex.1971), *aff'd* 474 F.2d 594 (5th Cir. 1973); *Lewis v. Chicago State College*, 299 F.Supp. 1357, 1360 (N.D.Ill.1969).

As originally passed, Title VII of the Civil Rights Act exempted all educational institutions with respect to faculty employment practices. 42 U.S.C. § 2000e–1 (1970), as amended. This exemption had not been part of the original Senate bill, but was proposed in a substitute bill submitted by Senators Dirksen and Mansfield, and adopted first by the Senate and later by the House. There is virtually no legislative history, however, which indicates the rationale for the exemption of educational institutions.

The Equal Employment Opportunity Act of 1972, 86 Stat. 103, sec. 3 (1972), amended Title VII to bring educational institutions within the purview of the Act. In the words of the House Report:

> There is nothing in the legislative background of Title VII, nor does any national policy suggest itself to support the exemption of these educational institution employees—primarily teachers—from Title VII coverage. Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment. [H.R.Rep.No.238, 92d Cong., 2d Sess. (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News pp. 2137, 2155]

The pervasive nature of discriminatory university employment practices has been well documented in the literature,[10] and was characterized in the Congressional debates preceding the passage of the 1972 amendments as "truly appalling," "gross" and "blatant."[11]

It is clear beyond cavil, then, that the Congress has evidenced particular concern for the problem of employment bias in an academic setting. Indeed it might be said that far from taking an anti-interventionist position with respect to the academy, the Congress has instructed us to be particularly sensitive to evidence of academic bias.

Accordingly, while we remain mindful of the undesirability of judicial attempts to second-guess the professional judgments of faculty peers, we agree with the First Circuit when it "caution[ed] against permitting judicial deference to result in judicial abdication of a responsibility entrusted to the courts by Congress. That responsibility is simply to provide a forum for the litigation of complaints of . . . discrimination in institutions of higher learning as readily as for other Title VII suits." *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 176, 177 (1st Cir., 1978). See also *Egelston v. State University College at Geneseo*, 535 F.2d 752 (2d Cir. 1976).

It is our task, then, to steer a careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior. *Faro* does not, and was never intended to, indicate that academic freedom embraces the freedom to discriminate.

## IV.

The district court correctly observed that the appropriate starting point for the evaluation of a personal claim of job discrimination brought under Title VII is *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There the Court indicated that:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii)

---

**10.** H. Astin, *The Woman Doctorate in America* (1969); L. Lewis, *Scaling the Ivory Tower: Merit and its Limits in Academic Careers* (1975); A. Rossi, *Academic Women on the Move* (1973); E. Wasserman, et al., *Women in Academia: Evolving Policies Toward Equal Opportunities* (1975); Divine, *Women in the Academy: Sex Discrimination in University Faculty Hiring and Promotion*, 5 Journal of Law and Education 429 (1976); *Hearings on Federal Higher Education Programs Institutional Eligibility Before the Special Subcommittee on Education of the House Committee on Education and Labor*, 93d Cong., 2d Sess., pt. 2B (1975).

**11.** See 118 Cong.Rec. 117 (1972) (remarks of Senator Bayh) and 118 Cong.Rec. 1992 (1972) (remarks of Senator Williams).

that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. . . . The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. [411 U.S. at 802, 93 S.Ct. at 1824.]

If the employer is able to sustain this burden, the burden shifts again to the plaintiff, who must "show that [defendant's] stated reason for [plaintiff's] rejection was in fact pretext." 411 U.S. at 804, 93 S.Ct. at 1825.

### A.

The trial court proceeded to indicate that Ms. Powell failed to make out a prima facie case of discrimination for two reasons. First, the court felt that Powell failed to prove that she was "qualified" to teach on the architecture faculty, given the negative faculty evaluations of her work. Second, the court indicated that Powell failed to demonstrate that other individuals possessing similar qualifications were hired after Powell was fired. We believe that the trial court applied an erroneous legal standard in reaching these conclusions, and that Ms. Powell has made out a prima facie showing of discriminatory treatment.

With respect to the first of the court's findings, we believe that the court's approach unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work. This is not merely of formal consequence, for it has the practical effect of requiring the employee to prove not merely that he possesses the basic skills necessary for the job, but rather that he is the best-qualified candidate for the job, under the criteria suggested by the employer. As can be seen in the present case, this burden is extremely difficult to meet if the employer's claim that the employee did not meet some unstated level of performance is

sufficient to negate the employee's offer of proof. In this respect, we agree with the Seventh Circuit's view that under *McDonnell Douglas*

> [t]he plaintiff need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him.
>
> .　　.　　.　　.
>
> Satisfactory performance is an ordinary prerequisite of continued employment, just as job qualification is an ordinary prerequisite to hiring. [Citation omitted.] However, the plaintiff need not, and indeed cannot, disprove as a cause of his discharge a source of dissatisfaction of which he is unaware. Accordingly, the employer's acceptance of his work without express reservation is sufficient to show that the plaintiff was performing satisfactorily for the purpose of shifting the burden of proof.
>
> [*Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277 at 1283 (7th Cir. 1977)].

Ms. Powell was hired by the School of Architecture after a careful review of her qualifications, training, and past performance. In addition, she was reappointed after her first year of teaching. While some members of the faculty may have expressed dissatisfaction with some aspects of her work, this dissatisfaction was never communicated to Ms. Powell, who was, accordingly, in no position to disprove these alleged inadequacies.

We agree with the Seventh Circuit that proof of competence sufficient to make out a prima facie case of discrimination was never intended to encompass proof of superiority or flawless performance. If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing. In the context of this case, Ms. Powell has demonstrated that she possesses the basic skills necessary for the performance of her job, and has thereby made out a prima facie showing of competence.

With respect to the second factor, the School of Architecture's hiring of a white female with a M.F.A. degree to teach basic design is sufficient to satisfy the *McDonnell Douglas* requirement that the position remain open and the employer seek applicants from persons of the complainant's qualifications. The trial court believed that a time gap of over two years between the appellant's discharge and the other individual's employment precludes the possibility that the other individual "replaced" appellant. And the trial court may well be correct in the more common case in which hiring is ongoing and employees largely fungible.

In the context of university employment, however, a department or school may hire only a small number of individuals each year, and the fact that a position may go unfilled for a time does not indicate that the position has been terminated. It only indicates that the school has not yet located the candidate of its choice.

Thus Ms. Powell has, as a matter of law, been able to demonstrate both her competence and the architecture school's ongoing hiring efforts. This, coupled with undisputed proof of minority status and the termination of her employment contract, is sufficient, under *McDonnell Douglas*, to make out a prima facie case of discriminatory treatment.

### B.

The more difficult issue before us is whether, on the present state of the record, the School of Architecture can be said to have successfully rebutted Ms. Powell's showing by articulating a "legitimate, non-discriminatory reason for the employee's rejection."

In this regard the trial court found that: [A] contract for the academic year 1974–75 was not offered to [the appellant] for one reason only. The Tenure Committee honestly reached the conclusion that plaintiff's performance fell short of teaching requirements, after affording her a fair opportunity to demonstrate her teaching ability. This determination was devoid of any racist or sexist base. The plaintiff has not demonstrated the assigned reason to be a pretext for prohibited discriminatory conduct. All of the eight members of the Tenure Committee who voted against plaintiff testified that they voted to terminate plaintiff essentially because of the poor work product of her rendering students, and her inadequate architectural background. These are matters of obvious concern to the architecture faculty and, therefore, are unquestionably legitimate reasons for the vote.

[App. at 17–18.]

Rule 52(a) of the Federal Rules of Civil Procedure requires that findings of fact made by a trial court shall not be set aside unless clearly erroneous. Where, as here, a case is heard on the basis of a record developed before another judge, a trial judge is necessarily unable to make first-hand assessments of credibility, and the broad deference normally due a trier of fact under the federal rules may be somewhat attenuated. See 5A *Moore's Federal Practice* ¶ 52.04 and the cases cited therein.

Nevertheless, after a careful review of the record, we cannot say that the trial court's finding in the instant case is clearly erroneous. The court considered testimony by all eight members of the Tenure Committee, and was unable to discern either overt or covert discrimination on the part of those officials. And our own independent review of the record confirms these findings, which are supported by substantial evidence, and which do not leave us "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

It would, of course, have been preferable if the School of Architecture had presented the court with a more fully developed description of the appellant's duties, and the criteria used in assessing her performance. In that way the legitimacy and rationality of the school's hiring practices would have been more immediately evident. But the

law does not require, in the first instance, that employment be rational, wise, or well-considered—only that it be nondiscriminatory. And the record here simply does not support the appellant's contention that her termination was the result, in whole or in part, of racial or sexual animus.

Accordingly, we affirm the judgment of the district court.

MOORE, Circuit Judge (concurring):

In the dicta comprising Part III, the majority opinion purports to strike a blow for justice by encouraging the courts to intervene into the affairs of our colleges and universities. Any reluctance of the federal courts to interfere with the decision-making process of universities does not come from an interest in promoting discrimination. Rather, such reluctance reflects the inability of the courts to perform "a discriminating analysis of the qualifications of each candidate for hiring or advancement, taking into consideration his or her educational experience, the specifications of the particular position open and, of great importance, the personality of the candidate." *Faro v. New York University*, 502 F.2d 1229, 1232 (2d Cir. 1974). The courts in cases cited by the majority, in my opinion, have not abdicated their responsibility to uphold the Equal Employment Opportunity Act of 1972. Instead, they have indicated the difficulty faced by courts in attempting to evaluate the ability of a faculty member.

"A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards." *Lewis v. Chicago State College*, 299 F.Supp. 1357 (N.D.Ill.1969).

This difficulty has done no more than create a justified reluctance among the courts to override the "rational and well-considered judgment of those possessing expertise in the field". *Green v. Board of Regents of Texas Tech University*, 335 F.Supp. 249, 250 (N.D.Tex.1971), *aff'd*, 474 F.2d 594 (5th Cir. 1973). *See Huang v. College of the Holy Cross*, 436 F.Supp. 639,

653 (D.Mass.1977); *Peters v. Middlebury College*, 409 F.Supp. 857, 868 (D.Vt.1976). If we took a "common sense position" in *Faro* (and there is no good reason here presented to abandon this approach), we appear to have the support of many other courts.

As to the merits of this case, I agree that Syracuse University successfully rebutted the contention that Powell's termination was the result of racial or sex animus. In addition, I believe that Powell did not even establish a *prima facie* case of discrimination. The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) articulated a standard that the complainant must meet in order to establish a *prima facie* case. The complainant must show:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." [13]

[13] The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."

Id. at 802, 93 S.Ct. at 1824.

In *McDonnell Douglas* the company did not "dispute [claimant's] qualifications and acknowledge[d] that his past work performance in [McDonnells Douglas'] employ was satisfactory." *Id.* The particular qualifications of a job must of necessity vary with the occupation and the type of employer. Qualifications for a job to work as a mechanic for a manufacturer (as in *McDonnell Douglas*) are more easily measured and quantified than qualifications to hold a faculty position at a university. Here Powell did not prove that she was qualified for the job for which Syracuse University was seeking applicants and that Syracuse University continued to seek applicants with Powell's qualifications.

While generally an architecture degree is a prerequisite for teaching in the School of Architecture at Syracuse University, exceptions are made for certain courses such as history of architecture and basic design. Powell, with a degree in fine arts, had no teaching experience at the time she was hired as a part-time lecturer in 1972. Even assuming that she met the minimum educational requirements to be employed initially in a teaching position, the mere attainment of a degree does not qualify an individual to teach in a university. Powell never demonstrated that she was qualified to continue her post at Syracuse University. To the contrary the members of the Tenure and Promotion Committee based their conclusion not to rehire Powell on the grounds that her academic background was inadequate and her students' work was inadequate. Also, there was some question whether her personality was appropriate for teaching and counseling students. These are factors which may properly be taken into account in determining whether a faculty member possesses the "qualifications" for continued employment.

In addition, Powell was not replaced by someone of comparable qualifications. After Powell was terminated in May 1974, Christopher Gray was hired in the fall of 1974 to teach the rendering course. He possessed different qualifications, having degrees in architecture and prior teaching experience. Subsequently, two white women without architectural degrees were hired. One, with a Ph.D. degree in art history, was hired to teach history of architecture, a course which Powell never taught. The other, with a degree in fine arts, was hired in the fall of 1975 to teach basic design. This was two years after Powell had ceased teaching that course, and she could not be considered to have "replaced" Powell.

Thus, I would conclude that Powell failed even to make a *prima facie* case of discrimination. This does not, as the majority opinion suggests, force the plaintiff to prove she is the best qualified for the job. Rather, it only forces the plaintiff to prove that she does meet at least the minimal level of competence required of a university faculty member, which she did not prove.