**Gary MORRIS, Plaintiff,**

v.

**CNY CENTRO, INC., Defendant.**

No. 98–CV–375.

United States District Court, N.D. New York.

June 12, 2000.

(citing *Lead Indus. Ass'n, Inc. v. OSHA,* 610 F.2d 70, 79–80 n. 17 (2d Cir.1979)).

Sonneborn Law Offices, Laura L. Spring, of counsel, Syracuse, NY, for Plaintiff.

Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C., Frank W. Miller, of counsel, Miles G. Lawlor, of counsel, East Syracuse, NY, for Defendant.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### INTRODUCTION

Defendant moves for summary judgment dismissing this employment discrimination action.

## BACKGROUND

Plaintiff, a black man, was first employed by defendant as a part-time bus operator on August 19, 1988. On February 9, 1990, he was promoted to full-time bus operator. Subsequently, plaintiff applied for and was offered the position of part-time relief supervisor and, between June 28, 1993, and October 3, 1993, he was trained for the positions of "outside supervisor" and "inside supervisor." As of October 3, 1993, he was fully trained for the position of "full-time relief supervisor." According to defendant, during this training period, plaintiff continued in his position as full-time bus operator and assumed supervisory duties on an as-needed basis.

Plaintiff claims that between June 28, 1993, and December 7, 1994, he was subjected to numerous incidents of racial harassment. Plaintiff's papers show that he made numerous verbal and written complaints to his superiors, and that on December 7, 1994, after he submitted to defendant a written complaint alleging harassment, he was demoted from the position of part-time relief supervisor and later denied a promotion to outside part-time supervisor.

In April 1995, plaintiff filed an administrative complaint with the New York State Division of Human Rights ("DHR"), alleging that he had been demoted from his position as part-time supervisor because of his race. On October 22, 1997, DHR issued a Determination and Order After Investigation finding "no probable cause" that Centro had engaged in unlawful discrimination, specifically finding: "Investigation revealed that complainant was demoted from his job as supervisor because he made excessive errors. Investigation did not reveal whites similarly situated who were differently treated."

Plantiff's DHR complaint was co-filed with the federal Equal Employment Opportunity Commission ("EEOC"). On December 1, 1997, EEOC issued a Right to Sue Letter concluding that "the evidence obtained during the investigation does not establish violations of the statute."

Plaintiff filed the complaint herein on March 3, 1998, setting forth causes of action for racial discrimination and retaliation in connection with his demotion pursuant to Title VII (42 U.S.C. § 2000e), section 1981 (42 U.S.C. § 1981) and New York Human Rights Law (New York Executive Law, §§ 290–301); hostile work environment under Title VII; and a New York common law claim for intentional infliction of emotional distress.

## THE MOTION

### Standard for summary judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)).

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See id.* at 322, 106 S.Ct. 2548. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

As stated by the Second Circuit in *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir.1998) (citations omitted):

As recent discrimination cases of our court have made clear, summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987).

**Racially discriminatory adverse employment action—McDonnell-Douglas test**

To evaluate plaintiff's claim for race discrimination under Title VII (first cause of action), New York Human Rights Law (second cause of action), and section 1981 (fourth cause of action), the Court applies the three-step, burden-shifting process articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

***Prima facie* case**

■ The first step in the *McDonnell Douglas* formulation requires plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination by the employer. *Bickerstaff v. Vassar College*, 196 F.3d 435, 446–47 (2d Cir.1999). To establish a *prima facie* case, plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination. *See Norville v. Staten Island University Hosp.*, 196 F.3d 89, 95 (2d Cir.1999). The burden of establishing a *prima facie* case is not onerous, *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997), *cert. denied* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); indeed, it has been described as "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Defendant argues that plaintiff is unable to establish either the second or fourth elements of a *prima facie* case of race discrimination. According to defendant, plaintiff cannot establish that he was qualified for the part-time supervisory position from which he was removed, nor can he establish that his removal from the position occurred under circumstances giving rise to an inference of discrimination.

■ To satisfy the second element of the test, the plaintiff need not demonstrate that his performance was flawless or superior; rather, he need only demonstrate that he possessed the basic skills necessary for performance of the job. *de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir.1996); *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.1978). The Court rejects defendant's position that, to establish a *prima facie* case, plaintiff must show that he was performing his duties satisfactorily. Such a requirement "unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work." *Powell*, 580 F.2d at 1155; *accord Visco v. Community Health Plan*, 957 F.Supp. 381, 385–86 (N.D.N.Y.1997). The Court finds that plaintiff has established the second element of his *prima facie* case by showing that he applied for, was interviewed for and was hired for the job; that he was trained for the job; and that he performed the duties of the job for over a year.

■ With respect to the fourth element, plaintiff has met his minimal burden of proving that the demotion occurred under circumstances giving rise to an inference

of discrimination. Plaintiff has shown that he was demoted despite his qualification for the job after being subjected to what he claims was a hostile work environment and immediately after sending to John Rennock, Centro's Vice President, a written complaint of harassment.

In the view of the Court, plaintiff has met his minimal burden of establishing a *prima facie* case, thus shifting the burden to defendant to articulate a non-discriminatory reason for the demotion.

### Non-discriminatory reason for employer's actions

In the second step of the *McDonnell Douglas* test, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Bickerstaff,* 196 F.3d at 446. The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision. *St. Mary's,* 509 U.S. at 507, 113 S.Ct. 2742.

Defendant here has met its burden by showing that as part-time supervisor plaintiff made numerous errors—many more than most supervisors—and that his performance was unsatisfactory. For example, defendant states that as a result of plaintiff's poor record-keeping and inattention to detail, hours worked by bus operators were misreported on several occasions, once by more than 200 hours, and overpayments totaling at least $2,700 were made to 21 Centro employees. Defendant further alleges that plaintiff's record-keeping errors and failures to follow proper scheduling procedures created confusion and errors in assigning bus drivers to scheduled routes and determining what bus operators to call in for duty. According to defendant, plaintiff persistently misreported starting and stopping times for operators, made numerous errors and omissions on radio logs and assignment sheets, and failed to record a radio transmission from a bus operator, preventing defendant from investigating a driver-related incident. Defendant further avers that plaintiff refused to accept responsibility for his errors, blamed others for his mistakes, and took offense to innocuous statements and comments from co-workers, complaining that they were "rude," "unprofessional" and "nasty." According to John Rennock, who made the decisions to appoint and remove plaintiff as supervisor, plaintiff's defensive nature and inability to accept constructive criticism made him a poor candidate for retraining.

### Pretext

The burden then shifts back to plaintiff in the third step of the *McDonnell Douglas* process. "The plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that race was." *Fisher,* 114 F.3d at 1335–36 (internal quote omitted). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff,* 196 F.3d at 446–47. In his deposition testimony, plaintiff challenges many of defendant's assertions and/or gives alternative explanations for the incidents. Plaintiff's counsel also states in her affidavit that she reviewed voluminous payroll records kept by white employees during the same time period and found numerous errors. Plaintiff also points to evidence that white employees who made errors were retrained, not demoted.

In support of his claim of pretext, plaintiff also submits the affidavit of Chuck Watson, employed by Amalgamated Transit Union Local 580 as Business Agent and Financial Secretary/Treasurer. Watson says he conducts all the business of the local transit workers' union and, until 1991, was a bus operator for defendant. He states: "I have personal knowledge that all the Supervisors black and white at times made payroll errors. . . . I am familiar with

numerous egregious payroll errors made by Centro Supervisors other than Gary Morris." Watson characterized the payroll system during 1993 and 1994 as "fraught with problems" and stated that, because of the number of errors, defendant changed the payroll system. Watson further stated in his affidavit that Bob Besaw, a white supervisor, made numerous payroll errors, and observed that "[Besaw] believed he knew all the payroll numbers by memory but, in fact, he did not. Therefore, the wrong operators were paid." According to Watson, in 1995, defendant tried to recoup monies that were overpaid to bus operators in the total amount of $50,-000.00, which resulted in a time-consuming reimbursement procedure in order for the bus operators to get the correct pay. Watson stated that he believed that no one was demoted or terminated for these errors.

■ Considering the totality of the evidence, including Watson's affidavit, plaintiff has made a sufficient showing of discrimination and pretext to defeat summary judgment.

**Plaintiff's hostile work environment claim**

■ The third cause of action claims that defendant created a hostile work environment in violation of Title VII. A hostile work environment claim will succeed only where the conduct at issue is so severe or pervasive as to create an objectively hostile or abusive work environment, and where the victim subjectively perceives the environment to be abusive. *See Harris v. Forklift Systems,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426 (2d Cir.1999). There is no dispute that plaintiff here subjectively perceived his environment to be hostile and abusive; thus, the question is whether the environment was objectively hostile, that is, whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse. *Richardson,* 180 F.3d at 436. Factors relevant in determining whether working conditions meet this standard include the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; and what psychological harm, if any, resulted. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–68 (2d Cir.1998).

■ In order "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997), *accord Kotcher v. Rosa and Sullivan Appliance Ctr.,* 957 F.2d 59, 62 (2d Cir.1992). A court should not exclusively focus on either the frequency of the incidents, or on the severity of any one incident, but rather should view the totality of the circumstances and evaluate the quantity, frequency and severity of the incidents to determine whether, as a matter of law, the incidents could amount to a claim of hostile work environment. *Richardson,* 180 F.3d at 437; *Schwapp,* 118 F.3d at 112.

Plaintiff testified at his deposition that he experienced the following incidents involving his white co-workers: in the course of discussing a white bus operator who applied for the part-time supervisor position at the same time plaintiff did, but was not selected, Dave Mix told plaintiff that defendant needed black supervisors, which, from the context of the conversation, plaintiff understood to mean that plaintiff had been selected because he was black and not due to his qualifications; Carl Baker told plaintiff that "we supervisors take care of each other," which, from the context of the conversation, plaintiff understood to mean that white supervisors take care of other white supervisors; on several occasions when plaintiff relieved

another supervisor who was black, Duke Bailey stated that plaintiff was relieving his "brother"; plaintiff was constantly harassed by Scott Vanderpool, e.g., Vanderpool would throw assignments and papers at plaintiff; Ellie Ruston directed plaintiff to talk to another black bus operator regarding an incident report because "they were both black"; Don Cox instructed plaintiff not to let the black relief boardman into the radio room for coffee or to use the telephone whereas the white boardmen were permitted to enter the radio room for coffee and to use the telephone; Dave Kreisel repeatedly addressed plaintiff as "boy"; and Bob Besaw, a supervisor who trained plaintiff and another black trainee, Cornell Scott, for inside supervisor, said they were not learning as fast as other trainees, which plaintiff understood to mean that the white trainees learned faster than the blacks. Plaintiff stated that he and Scott experienced many harassing incidents which, like a number of the above, were not expressly racial, but which, from plaintiff's observation, were not experienced by white co-workers.

As in *Richardson*, 180 F.3d at 439–40, assuming the truth of plaintiff's allegations, the incidents experienced by plaintiff are such that a reasonable juror could find that plaintiff's working conditions were altered for the worse by the alleged harassment. Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee, but the potential for such disagreement renders summary judgment inappropriate.

### Employer liability

When a co-employee—as distinct from a supervisor—is alleged to have engaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it. *Quinn*, 159 F.3d at 767; *Richardson*, 180 F.3d at 441. Defendant argues that most, if not all, of

the alleged incidents of harassment underlying Plaintiff's hostile work environment claim were carried out by fellow bus operators, plaintiff's co-employees, and that therefore defendant can be liable for the alleged harassment only if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.

Defendant contends that it provided ample avenue for complaint. It avers that its equal employment opportunity and no-harassment policies established procedures for the reporting and investigation of discriminatory conduct and that the collective bargaining agreement allowed for the grieving of conduct in violation of federal and state law, including anti-discrimination laws. Plaintiff disputes defendant's claim that a harassment policy and complaint procedure were in effect at the relevant times. He presents evidence, including affidavits from two other bus drivers, Stanley Hines and Andrew Martino, and a local union official, Chuck Watson, that there were no harassment policies posted before 1997. He also states that during the relevant time he was provided only with the Centro Rules and Regulations Handbook, which does not contain any discrimination and/or harassment policies or any grievance or reporting procedures. Plaintiff states that he never received a Salaried Employee Handbook, which is dated as having been prepared in May 1994 and which contains a discrimination policy. There is no evidence that Plaintiff was provided with this handbook or was aware of any policies or complaint procedures. Further, plaintiff states that he believed that the grievance procedure provided in the collective bargaining agreement was not available to him as a supervisor.

With respect to whether defendant knew of the harassment but did nothing about it, defendant points to plaintiff's deposition testimony that he had no recollection of reporting to Centro management many of the incidents underlying his harassment claim. Plaintiff also testified,

however, that he verbally reported to defendant's Vice President, John Rennock, a number of the incidents, including those mentioned above involving Besaw, Ruston, Baker and Bailey. Rennock's position, in which he had the authority to hire and fire employees, was such that it is reasonable to impute his knowledge to defendant. According to plaintiff, although Rennock frequently responded that he would "take care" of the problems, it did not appear that Rennock actually did anything about them. Plaintiff also stated that a manager, Tom Shallcross, ordered him to "write up" black bus operators for violations but never ordered him to write up white bus operators for similar violations; it is not clear from the record whether Shallcross's position was such that defendant could be vicariously liable for his conduct. Plaintiff also testified that Vince Tricholo, his superior, discussed the alleged harassment with plaintiff and told him he should "watch his back," which from the context of the discussion plaintiff understood to mean that Tricholo believed that the white supervisors were "out to get [plaintiff] relieved as a part-time supervisor." Whether Tricholo's position was such as to support a finding that his awareness of the alleged harassment can be imputed to defendant is not apparent from the record. Also, plaintiff addressed to Rennock numerous written complaints about his treatment. These complaints did not specifically refer to racial discrimination. Whether, under all of the circumstances, these written complaints should have alerted defendant that plaintiff, a black man, was experiencing problems which might be racially-motivated and should be addressed in some manner, cannot be determined on this record.

■ Questions of fact exist regarding whether and to what extent plaintiff's superiors were aware or should have been aware of the situation, whether their responses were reasonable, and whether their knowledge and conduct is attributable to defendant. Questions also exist with respect to the adequacy of defendant's harassment policy, when it was instituted, and whether defendant took reasonable steps to make its employees aware of it.

**Timeliness of plaintiff's hostile work environment claims**

Plaintiff filed an administrative charge of discrimination with the SDHR on April 18, 1995, alleging that his December 1994 demotion was in retaliation for his complaint of harassment. Thus, the administrative proceeding was commenced within 300 days after the alleged discriminatory employment action. Some of the incidents on which plaintiff relies to support his claim of hostile work environment, however, occurred more than 300 days prior to the filing. Defendant contends, therefore, that plaintiff cannot rely on these earlier incidents or introduce proof concerning them at trial. Plaintiff counters that they are admissible as part of a continuing violation.

■ The Second Circuit has recognized the "continuing violation" exception to the 300 day limitation period. *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994). Under this doctrine, "if a Title VII Plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993). The discriminatory incidents must be specifically related and be allowed to continue unremedied for so long as to amount to a discriminatory policy or practice. *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996).

Accepting plaintiff's allegations as true for the purposes of this motion, and drawing all reasonable inferences in his favor, the Court concludes that he has submitted

adequate evidentiary proof of a continuing violation to withstand this motion.

**Retaliation**

 To establish a prima facie case of retaliation, a Plaintiff must show, by a preponderance of the evidence, 1) participation in a protected activity that is known to the defendant, 2) an employment decision or action disadvantaging the plaintiff, and 3) a casual connection between the protected activity and the adverse decision. *Richardson,* 180 F.3d at 443. Retaliation in violation of Title VII occurs when a retaliatory motive plays a part in the adverse employment action, whether or not it was the sole cause, or when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist. *Cosgrove v. Sears, Roebuck and Co.,* 9 F.3d 1033, 1039 (2d Cir.1993). An employee need not establish that conduct opposed was in fact a violation of Title VII, but rather, only that the employee had a good faith reasonable belief that it was unlawful. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Manoharan v. Columbia Univ. College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

 Plaintiff has shown that he submitted verbal and written complaints of numerous incidents of alleged harassment by co-workers and supervisors while he held the position of part-time relief supervisor. According to plaintiff, defendant failed to respond or make any effort to prevent further incidents. Plaintiff was not instructed to fill out a complaint form, nor was he advised of any complaint procedure. The weekend prior to his demotion on December 7, 1994, plaintiff submitted a memorandum to defendant's Vice President, John Rennock, in which he specifically used the word "harassment." A complaint of discriminatory harassment constitutes a protected activity and satisfies the first element of a *prima facie* case of retaliation. The fact that plaintiff was demoted within days after his written complaint to Rennock specifically using the word "harassment," viewed in the context of the surrounding circumstances, is sufficient for purposes of this motion to suggest a causal connection between the protected activity and the demotion. There is sufficient proof in the record to resist summary judgment on this issue.

**Intentional infliction of emotional distress**

The New York common-law tort of intentional infliction of emotional distress is subject to a one-year statute of limitations. N.Y.C.P.L.R. 215; *see Peters v. Citibank, N.A.,* 253 A.D.2d 803, 677 N.Y.S.2d 626 (2d Dep't 1998). This action was commenced in March 1998; thus, the claim of intentional tort, based on conduct allegedly occurring between June 1993 and December 1994, is time-barred. The fifth cause of action must be dismissed.

## CONCLUSION

Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment is granted to the extent that summary judgment dismissing plaintiff's fifth cause of action for intentional infliction of emotional distress is granted; and it is further

ORDERED that defendant's motion for summary judgment is otherwise denied.

IT IS SO ORDERED.